UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ASSOCIATED GENERAL CONTRACTORS
OF NEW YORK STATE, LLC, ASSOCIATED
GENERAL CONTRACTORS OF AMERICA, INC.,
BUSINESS COUNCIL OF NEW YORK STATE,
NORTHEASTERN SUBCONTRACTORS                    Case No.:  1:26-cv-1139 (AMN/DJS)
ASSOCIATION, INC., NATIONAL ELECTRICAL
CONTRACTORS ASSOCIATION, ALLIED
BUILDING METAL INDUSTRIES, INC., BUILDING
CONTRACTORS ASSOCIATION, INC.,
PRECAST/PRESTRESSED CONCRETE INSTITUTE
(PCI) NORTHEAST, UTILITY CONTRACTORS
ASSOCIATION OF NEW YORK, INC.,
E.W. HOWELL CO., LLC, and W.M. SCHULTZ
CONSTRUCTION, INC.,

                              Plaintiffs,

     -against-

KATHLEEN HOCHUL, *in her official capacity as*
*Governor of the State of New York;* ROBERTA
REARDON, *in her official capacity as Commissioner*
*of the New York State Department of Labor*; SHAUN
MCCREADY, *in his official capacity as Director*
*of the Bureau of Public Work and Prevailing Wage*
*Enforcement*; and LETITIA JAMES, *Attorney General of*
*the State of New York,*

                              Defendants.

_____

## **COMPLAINT**

Plaintiffs Associated General Contractors of New York State, LLC ("AGC NYS"),

Associated General Contractors of America, Inc. ("AGCA"), the Business Council of New York

State (the "Business Council"), Northeastern Subcontractors Association, Inc. ("NESCA"),

National Electrical Contractors Association ("NECA"), Allied Building Metal Industries, Inc.

("Allied"), Building Contractors Association, Inc. ("BCA NY"), Precast/Prestressed Concrete

1

Institute of Northeast ("PCINE"), Utility Contractors Association of New York, Inc. ("NUCA NY"), E.W. Howell Co., LLC ("E.W. Howell"), and W.M. Schultz Construction, Inc. ("Schultz") (collectively, "Plaintiffs"), by and through their attorneys, Hinckley, Allen & Snyder LLP, as and for their Complaint against Defendants Kathleen Hochul, in her official capacity as Governor of the State of New York; Roberta Reardon, in her official capacity as Commissioner of the New York State Department of Labor; Shaun McCready, in his official capacity as Director of the Bureau of Public Work and Prevailing Wage Enforcement; and Letitia James, Attorney General of the State of New York, hereby allege as follows:

## PRELIMINARY STATEMENT

1.      New York has required the payment of prevailing wages to construction workers on public works projects and dedicated off-site extensions of those projects for nearly a century. The calculation of those prevailing wages is relatively straightforward.  It is a function of the hours worked on a given day, multiplied by the prevailing wage rate for the applicable classification of the worker in the county where the public works project is located.

2.      Companies employing workers on covered projects are required to submit certified payrolls confirming proper payment, signed under penalty of perjury. Even unintentional non-compliance can carry severe financial consequences.  Non-compliance deemed "willful" by the New York State Department of Labor (the "NYSDOL") can result in termination for cause, being banned from future public work (debarment), and misdemeanor or felony criminal charges.

3.      A general contractor ("GC") is vicariously liable for the prevailing wage violations of its lower tier subcontractors.  GCs manage this risk by monitoring the work through on-site superintendents or foremen who track subcontractor staffing and hours, which can then be cross-checked against subcontractor certified payrolls to ensure accuracy.

2

4.      This action challenges an unprecedented and unconstitutional expansion of the prevailing wage law in the recently enacted N.Y. Labor Law § 220(3)(f) (the "Amendment"). The Amendment, which goes into effect on June 18, 2026, is a misguided, experimental attempt to map the prevailing wage framework for the very first time to off-site fabrication facilities that manufacture products not just for one specific public project, but for many public and private projects across the State and beyond.

5.      The Amendment requires fabricators furnishing custom products to qualified public projects to register as subcontractors with the State; pay the prevailing wage of the county where the project sits, regardless of where the fabrication occurs or how many different projects the fabricator is supplying; and submit certified payrolls. The Amendment also imposes strict reporting obligations on GCs and makes them vicariously liable for prevailing wage compliance by every fabricator they purchase products from for use on a public project.

6.      New York's enactment of the Amendment was an *ultra vires* act because New York lacked the power to enact the Amendment under the Commerce Clause, which gives Congress *exclusive* jurisdiction over regulating foreign commerce and prohibits States from discriminating against interstate commerce.  Defendant Governor Kathy Hochul had no authority to sign the Amendment into law.  The Amendment is, therefore, void *ab initio* and unenforceable.

7.      Even if New York had the power to pass the Amendment, the Amendment violates the foreign Commerce Clause by regulating international commerce.  The Amendment does this by mandating that public owners, GCs, and subcontractors make its requirements a "condition of the contract" regardless of whether the fabrication occurs in New York or "in another jurisdiction." The Amendment thereby imposes New York's prevailing wage regime on manufacturers operating in Germany, Mexico, Canada, and other countries for work performed entirely on foreign soil.

3

This impairs the federal government's ability to speak with one voice and creates a substantial risk of provoking retaliatory action by foreign governments.

8.      The Amendment also violates the dormant Commerce Clause by reaching over state lines and forcing out-of-state fabricators to subject themselves to the entire regulatory apparatus of the NYSDOL to continue supplying products to New York public projects.  That is particularly impractical and unreasonable for companies who perform only a small amount of New York public work because they are focused and located elsewhere, and who have their own state's or country's regulations to comply with.

9.      New York intended this extraterritorial application.  The legislative history confirms express protectionist intent: that the out-of-state component of the Amendment is to protect in-state fabricators from out-of-state competition, not to advance any legitimate worker-protection interest.  It discriminates against out-of-state companies by impairing their ability to compete on price and forcing them to comply with and bear the cost of compliance with a new regulatory scheme in addition to that of their home state.[1]

10.     In addition to unconstitutionally targeting out-of-state fabricators, the Amendment is unfeasible and will devastate New York's public construction industry.  Because fabrication workers never set foot on the project site, coverage under the Amendment cannot rely on the same simple locational test (i.e., was the work performed on a prevailing wage project site that day) that has historically applied.  The Amendment instead creates a fundamentally unworkable substitute from legislators with no apparent understanding of how the industry works.

---

[1] Without this discrimination, the Amendment would have raised prices for New York companies only, putting them at a disadvantage, which legislators did not want.  The extraterritorial application is intertwined with the rest of the Amendment, and the entire Amendment must fall.

11.     For example, the Amendment applies to a non-exhaustive list of products including "wall panel systems, woodwork, electrical plumbing, heating, cooling, ventilation or exhaust duct systems, rebar cages, and mechanical insulation …."  These categories are broad, undefined, and imprecise.  GCs, subcontractors, and fabricators do not know what products are covered.

12.     The Amendment also applies to products that are "solely and specifically designed and engineered for a specific public work project" (i.e. custom), but not products that are "stocked or readily available."  Those are not terms of art in the construction industry. To owners, GCs, subcontractors, and fabricators, the line between stock and custom is a complex, case-by-case determination with limitless potential permutations.

13.     The Amendment also excludes products that will ultimately be installed in certain "transportation" or "affordable housing" projects,[2] but those terms are also undefined, and projects can have transportation or affordable housing aspects that are but one part of a broader whole, making it unclear how the carve-outs apply.

14.     The result is a law that does not provide fabricators – or the contractors who have vicarious liability for their non-compliance – fair notice of what it requires, and invites arbitrary enforcement by Defendants.  GCs, subcontractors, and fabricators do not understand how the Amendment applies in the context of specific industries and projects, or how it applies to the many variable products they create and install.

15.     In any event, even if the statute had identifiable parameters, which it does not, GCs, subcontractors, and fabricators *still* could not comply because employees at fabrication shops are not dedicated to one project for extended durations like on-site workers.

---

[2] There is no discernible rationale for identical products being excluded based solely on project type.

16.     Off-site fabrication facilities are factories that process many orders for many clients at one time.  Employees move between projects, tasks, and materials throughout the same shift. The very same production line often processes public and private work, in-state and out-of-state work, and work destined for different New York counties.

17.     These employees are paid hourly wages based on seniority and skill according to local market rates and collective bargaining agreements ("CBAs").  The shops are not set up to track who worked on what, for how many minutes, whether the product was stock or custom, whether it was destined for a transportation or affordable housing public project, or what county the public project was located in.  Tracking the level of detail required by the Amendment will be a complicated, cost-prohibitive, nightmare, and in many cases, objectively impossible.

18.     Predictable compensation will be a thing of the past.  Fabricators will be forced to calculate and pay amalgamated hourly rates that change by the minute based on the location of the public projects rolling through a factory.

19.     The impact on morale and teamwork will be immediate and incurable.  Disputes will break out on shop floors about who gets assigned to public work from "high value" New York counties and grievances and litigation will follow.

20.     The issues are even more acute for fabricators in rural areas, where market rates for fabricator wages are less than half the prevailing wage rates in large metropolitan centers that those fabricators will need to pay if they supply to a public project located there.

21.     Shops with CBAs with negotiated worker classifications, wage schedules, and benefits payments are forced to choose between complying with the Amendment or breaching their CBAs, prompting grievances and risking complaints of Taft-Hartley Act violations.

22.     Prevailing wage classifications were also developed for nearly a century with only on-site workers in mind.  Certain employees, particularly those performing unskilled or support work on the factory floor, do not have on-site equivalents that are recognized in prevailing wage schedules for fabricators to pull from.  Those workers will need to be paid under a classification inconsistent with their skill level and training, or more likely, terminated and replaced with workers who do have that skill level and training.  If those higher-skill workers cannot be found, employers must choose between gross-overpayment and understaffing.

23.     The Amendment also undermines the industry's ability to train its next generation of skilled workers by complicating the employment of apprentices.  The NYSDOL sets defined ratios on the number of apprentices to journeymen a contractor must maintain to be eligible to pay apprentices at the lower apprentice rate.  That system breaks when apprentices in the shop working products destined for many different projects are pulled into ratio calculations.  On-site apprentice counts will be pushed over allowable caps, perhaps for just a few minutes at a time, while the in-shop apprentice works on a given item.  This will force employers to pay the in-shop apprentice as a journeyman, or worse, if the employer miscalculates or fails to properly track the ever-changing ratio, face a NYSDOL violation.  The much easier, safer path will be to stop employing apprentices in the shop entirely.

24.     In any event, these implementation quagmires are for the few fabricators, if any, who can track the work in the manner required by the Amendment.  Most cannot.  The systems do not exist or do not apply to the workflows used to build certain products.

25.     These fabricators face a catch-22.  They can continue to operate and hope that Defendants will not deem their non-compliance willful under the circumstances, or exit the New York public market and forfeit years or decades worth of investments in relationships, reputation,

7

infrastructure, and personnel.  With the potential for hefty fines, wage lawsuits, debarment, and criminal exposure, many companies are choosing the latter option.

26.    GCs face similar problems.  It is one thing to hold them responsible for prevailing wage non-compliance of on-site subcontractors where GCs can monitor their work.   The Amendment makes them vicariously liable for prevailing wage violations by their suppliers, even where those suppliers are in different counties, states, and even countries.  GCs have no possible way to verify these suppliers' compliance efforts.

27.    GCs also face exposure for the cost implications of the Amendment, since it is GCs who submit binding bids to public owners under New York's competitive bidding statutes.  Those bids are built from subcontractor and fabricator quotes, whose pricing will now be poisoned by the uncertainty caused by the incurable flaws in the Amendment.

28.    The Legislature was made aware of these many problems and responded to them flippantly.  In response to concerns the Amendment is impossible to implement, the bill sponsor stated: "I suggest to you that these construction companies will be able to work this out."

29.    When asked a simple question about the line between stock and custom and whether "a 12-foot widget modified to 11 feet for a particular project would be covered" by the Amendment, the sponsor was unable to answer.

30.    In floor debates on the Amendment and prior iterations of the bill, the bill's sponsor explained that "the Department of Labor would be willing to assist contractors in understanding this in a better way."  The NYSDOL, however, has not promulgated rules in connection with the Amendment or initiated any rulemaking process.  Nor has the NYSDOL issued guidance, which would in any event be non-binding and subject to change.

31.     For example, will the NYSDOL list every conceivable construction-related product and potential modification to tell fabricators if that turns the product from stock to custom?  Will it do so in the form of a rule (which it has no time to promulgate before the law goes into effect on June 18, 2026), so contractors can make investment and other business decisions based on it, rather than guidance subject to change on a whim?

32.     How will the NYSDOL enforce the Amendment out of state or out of country?  If the NYSDOL collects money for underpayments from a New York GC, will it route that money to workers in other countries to whom it is purportedly owed?

33.     Upon information and belief, the NYSDOL cannot answer these questions because the problems posed by the Amendment are baked into its very core.  Indeed, just two months ago, the NYSDOL told a group of fabricators the law had key ambiguities that the NYSDOL did not understand.  Guidance will be rearranging chairs on the deck of the Titanic.

34.     The Amendment lacks and defies any reasonable standards for enforcement.  It invites arbitrary and discriminatory application, on a case-by-case basis, with companies in New York, other states, and overseas only learning that they crossed a red line when the NYSDOL or AG pursues them for a prevailing wage violation and slaps them with associated civil and criminal penalties.  Prevailing wage compliance does not lend itself to trial and error.

35.     The Amendment is already forcing companies to exit the public market.  This will bloat the price of public construction to cost-prohibitive levels; constrain the supply chain for New York public projects, thereby depriving these projects of the out-of-state inputs they need to move forward; render certain tradespeople unemployable or encourage their replacement with machines; and augment the shortage New York already faces of workers in the skilled trades by eliminating

opportunities for apprenticeship programs. Destroying companies, supply chains, public projects, and opportunities means *fewer* jobs and *fewer* hours for most workers.

36. The Constitution prohibits this type of governmental overreach by preventing states from projecting their regulatory authority into foreign nations and other states in a discriminatory manner or in a way that burdens interstate and international commerce; safeguarding negotiated contracts; ensuring due process and equal protection under the law; and protecting property rights and the right to pursue legitimate business enterprises.

37. The Amendment applies to projects advertised for bid on or after June 18, 2026. Plaintiffs face a genuine emergency that warrants the issuance of an injunction to stop Defendants from enforcing the law while this Court considers the merits of this Complaint to protect Plaintiffs and their members' constitutional rights.

38. Irreparable harm is already occurring as companies' constitutional rights are being violated, and because companies are ending relationships, announcing their intention to leave the public market, and making critical decisions and operational adjustments now in consideration of the Amendment's impending effective date.

39. Public owners also need the same certainty to plan project pipelines and ensure projects the taxpayers need move forward. Absent injunctive relief, months or years' worth of public bidding could be invalidated if the Amendment is later found to be unconstitutional and unenforceable, as claimed herein. That would be particularly problematic for projects governed by consent decrees with timing requirements for implementation.

40. These harms are concrete. As discussed below, they are distilled from more than a dozen companies the Amendment will devastate and the associations who represent their interests and those of the broader construction and business communities in New York.

41.    Plaintiffs seek to vindicate the deprivation of its members' federal constitutional rights under color of state statute, ordinance, regulation, custom, and/or usage.  Plaintiffs seek relief under 42 U.S.C. § 1983, and attorneys' fees, expert fees, and costs under 42 U.S.C. § 1988.

## THE PARTIES

42.    Plaintiff Associated General Contractors of New York State ("AGC NYS") is a trade association organized and existing under the laws of the State of New York based in Albany, New York, and a chapter of the Associated General Contractors of America ("AGCA").  AGC NYS is a leading voice of the building and highway heavy construction industry.  AGC NYS represents about 600 general contractors and construction managers who perform most of the building construction, highway heavy construction, municipal, and utility work in New York. AGC NYS works proactively to oppose anti-business legislation from becoming law and in support of legislative changes that will benefit the industry and its members, and monitors more than 300 construction-related bills per year on issues such as prevailing wage and other labor law matters.  AGC NYS is also a member of Plaintiff the Business Council.

43.    Plaintiff AGCA is the leading association for the construction industry nationwide. With over 28,000 member firms and  87 chartered Chapter affiliates, including AGC NYS, AGCA acts as the voice of the construction industry.  Members of AGC NYS are also members of AGCA by virtue of their chapter membership.  AGCA's legislative work includes advancing the interests of the construction industry with elected officials and shaping policies to support a stronger, more predictable and pro-growth climate for construction.

44.    Plaintiff the Business Council is the leading business organization in New York, representing the interests of large and small firms throughout the State.  The Business Council is headquartered in Albany, New York, and has been in operation since 1980.  The Business Council

11

serves as the primary, statewide association advocating for New York's business community. The Business Council has a broad array of members, including AGC NYS, contractors, subcontractors, builders associations, construction agencies, and fabricators. The Business Council advocates before New York's legislature and agencies to protect its members' interests regarding the business climate in New York.

45.    Plaintiff NESCA is a trade association founded in 1971 with approximately 500 member companies who are specialty subcontractors (including mechanical, electrical, and other specialty sub-trades) and material suppliers in northeastern New York. Many of NESCA's members are subcontractors to AGC NYS members. NESCA is very active legislatively and has drafted and helped enact more than 40 statutes benefiting its subcontractor members and the construction industry as a whole.

46.    Plaintiff NECA is a national professional association representing the electrical construction industry since 1901. The New York Council of NECA is a group of New York chapters representing NECA members who operate or work in New York. Among other work, NECA provides its members with labor relations, advocacy and education services.

47.    Plaintiff PCINE is a 30-year-old chapter of the Precast/Prestressed Concrete Institute representing the precast/prestressed concrete industry in New England and New York. PCINE's members supply structural building systems, architectural cladding, and transportation infrastructure components for projects throughout the Northeast, including New York public projects. PCINE has 17 manufacturer members both in and outside of New York. PCINE's mission is to grow awareness and market share of precast/prestressed concrete by educating stakeholders on how to design with and use precast concrete as an optimized building material. PCINE's members are the fabricators targeted by the Amendment.

12

48.    Plaintiff BCA NY is New York City's leading association of construction contractors and related industry professionals.  Established in 1933, BCA NY works with the organized building trades to provide strong industry leadership and a unified voice to address long-term labor management relationships.  BCA NY provides negotiation and administration of collective bargaining agreements with the Building Trades Unions, negotiating numerous agreements throughout the five boroughs of New York City, Westchester, and Long Island.  BCA NY also provides its members with legislative representation.

49.    Plaintiff NUCA NY is the New York chapter of the National Utility Contractors Association, the oldest trade association in the United States solely focused on underground utility and excavation contracting.  NUCA was established nationally in 1964, and the New York Chapter was established in 2025.  NUCA NY has 27 member companies comprised of underground utility and excavation contractors who perform underground utility work, specialty contractors who work on the same jobsites, and suppliers for those contractors and related firms.  Among other work, NUCA NY provides its members with federal and state regulatory information, advocacy, industry information, and tools to help them run their businesses more profitably and safely.  At the national level, NUCA is engaged on Capitol Hill and with the administration, advocating for infrastructure funding, for better regulatory policy, and serving as a liaison between contractors and government agencies on issues affecting underground infrastructure.  NUCA NY's Chapter Board monitors and responds to legislative and regulatory actions that affect the underground utility and excavation contracting industry in New York.

50.    Allied is one of the New York metropolitan area's oldest and most respected employer associations since its founding in 1922.  Allied's membership includes the leading erectors of structural steel, curtain wall, precast concrete, and architectural, ornamental, and

miscellaneous metal products in both building and heavy construction in the New York metropolitan area.  Together with its industry partners – Structural Iron Workers Locals 40 and 361 and Architectural and Ornamental Iron Workers Local 580 – Allied has continually strengthened our collaboration to ensure that modern building concepts are applied safely, efficiently, and with unmatched craftsmanship across the region.  Allied has approximately 45 members, all of which are union contractors.  Allied monitors legislative and regulatory developments affecting its members and, where possible, works with lobbying teams to shape legislation before enactment.  Allied also serves as liaison between its members and agencies relevant to the New York City construction industry, including the Department of Buildings, the Department of Transportation, the Bridge and Tunnel Authority, and the Metropolitan Transportation Authority ("MTA"), among others.

51.    AGC NYS, AGCA, the Business Council, NESCA, NECA, PCINE, BCA NY, NUCA NY, and Allied (together, the "Associations") each have associational standing to bring this action on behalf of their members, whose interests are directly and adversely affected by the Amendment.  The Associations' members are already suffering and face additional, imminent, actual injury as a result of the challenged statute.  They face a credible threat of enforcement under the Amendment: they must either comply with the law's impossible and vague requirements, exit the New York public works market, or face penalties, including criminal liability, civil penalties, potential debarment, and vicarious liability for fabricator non-compliance.  This lawsuit seeks to vindicate interests germane to the Associations' purposes, as part of each Association's mission is to protect its members' interests in connection with legislative and regulatory changes affecting the businesses, fabricators and/or the construction industry in New York.

14

52.     E.W. Howell is a general contractor and construction manager headquartered in Plainview, New York, with an additional office in Manhattan. E.W. Howell was founded in New York in 1891. E.W. Howell performs primarily vertical construction and employs approximately 200 people. E.W. Howell is a union shop signatory to its laborers' collective bargaining agreement. E.W. Howell works primarily in New York, and approximately half of its work at any given time is on New York public projects. E.W. Howell is a member of Plaintiffs AGC NYS and BCA NY among other professional associations.

53.     Schultz is a heavy civil contractor headquartered in Ballston Spa, New York. Schultz has been in continuous operation since it was established in 2000. Schultz performs excavation, underground utility work, and cast-in-place concrete construction, with a significant portion of its work in the environmental field, including drinking water and wastewater projects. Approximately 90% of Schultz's projects are New York public work, and these projects are generally publicly funded by towns, cities, villages, and state entities. Schultz employs approximately 70 employees. Schultz is a member of Plaintiffs AGC NYS, NESCA, and NUCA NY, among other professional associations.

54.     Defendant Kathleen Hochul is the Governor of the State of New York. Governor Hochul signed the Amendment into law with its chapter amendments.

55.     Defendant Roberta Reardon is the Commissioner of the NYSDOL. Defendant Reardon is charged with enforcing the Amendment.

56.     Defendant Shaun McCready is Director of the Bureau of Public Work and Prevailing Wage Enforcement. Defendant McCready is charged with enforcing the Amendment.

57.     Defendant Letitia James is the Attorney General of the State of New York and is charged with enforcing criminal violations of New York's prevailing wage law, including the Amendment.

## JURISDICTION AND VENUE

58.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under 42 U.S.C. §§ 1983 and 1988, and under the United States Constitution.

59.     Venue is proper in this Court because the Defendants' state agencies are headquartered within this judicial district and Plaintiffs and their members conduct business and suffer violations of their rights in this judicial district.  Thus, a substantial part of the events giving rise to Plaintiffs' claims occurred here.

## FACTUAL ALLEGATIONS

**I.      Off-Site Custom Fabrication in the Construction Industry**

60.     The New York construction industry employs hundreds of thousands of workers and generates billions of dollars in economic activity per year.

61.     Off-site fabrication is integral to modern construction.  Prefabrication boosts productivity and efficiency, increases worker safety, and allows for speedy delivery of materials needed to sustain the industry.

62.     As one non-partisan, advocacy coalition explained in a letter to Governor Hochul asking her to veto the Amendment before it became law: "custom prefabrication has become an essential and efficient part of modern construction – and one of the few remaining tools available to control costs and keep projects affordable in New York State.  Schools, fire stations, hospitals,

affordable housing developments, and other critical infrastructure projects often rely on custom fabrication shops to control costs, improve safety, and shorten construction timelines."

63.    Prefabrication can achieve these benefits because it takes place in controlled factory environments; is not impacted by weather or the seasons; is free from interference by other on-site trades; can occur on the ground level, as opposed to high in the air; can use heavy, immobile, or specialized factory-installed equipment; and allows for systemization and process refinement.

64.    Custom fabricators manufacture a nearly limitless number of products and systems, ranging from specialized building components such as wall panel systems, to structural components such as steel rebar cages used to strengthen concrete, to design and architectural elements such as custom ceiling panels.

65.    Fabricated components are transported to and installed at the project site by employees or companies who perform installation work.  If the project site is a public project, those installers are paid prevailing wages on the project site, consistent with New York law.

66.    Fabrication facilities are manufacturing operations, not construction sites. Workers at those facilities are employed year-round. They are not construction workers.  They have historically been paid under plant-level wage structures, CBAs, or market-based compensation systems.[3]

67.    GCs work hard to foster close relationships with custom fabricators, both in-state and out-of-state, who supply specialized components for their public projects.  The traditional billing model for those components is through freely-negotiated purchase orders, which are much simpler than the complex construction contracts between public owners, GCs, and subcontractors.

---

[3] Indeed, OSHA regulations recognize this distinction, with manufacturing governed primarily under 29 CFR 1910 – General  Industry Standards, and field construction work governed under 29 CFR 1926 – Construction Standards.

68.    Fabricators and general contractors have made significant investments in facilities, equipment, personnel, and supply chain relationships based on the reasonable expectation that labor costs for off-site fabrication would continue to be governed by market forces, as they have been for decades, rather than government-mandated prevailing wage rates.

69.    On competitively bid public work, specifications identifying products and systems contractors must price and procure are generally not released until the project is publicly advertised for bid.  Because the Amendment applies only to projects advertised on or after June 18, 2026, its project-specific consequences are unknowable until advertisement.

70.    There is no question, however, that Plaintiffs' members' prefabricated products will be infused into and comprise a large portion of virtually every public project that will be built after June 18, 2026.

71.    A bona fide and actual controversy exists between Plaintiff and the State regarding whether the Amendment violates the U.S. Constitution.

## II.    New York's Prevailing Wage Law and the Amendment

### A.    The Prevailing Wage Law

72.    New York's prevailing wage law, codified in Articles 8 and 9 of the Labor Law and rooted in Article 1, § 17 of the New York Constitution, governs working conditions, wages, and supplementary benefits for persons employed on public construction projects.

73.    The prevailing wage law was designed to ensure laborers, workmen, and mechanics working on project sites receive local prevailing wages.[4]   This framework aligns with the federal

---

[4] The original rationale for the law is troubling.  It was enacted in 1894 "in response to complaints of competition from Italian and other immigrant workers," and the law was amended to ban contractors from hiring "aliens."  *See* David Bernstein, *The Shameful, Wasteful History of New York's Prevailing Wage Law* , 7 Geo. Mason U. Civ. Rts. L.J. 1, 2 (1997).  By the 1930s, prevailing wage requirements, which guaranteed union wages on public projects, "had a devastating effect on the employment of African-Americans in the New York construction industry" because

Davis-Bacon Act, which mandates federal prevailing wages be paid to workers employed "on the site of the work," but which *excludes* permanent fabrication plants from its coverage.

74.     Under the prevailing wage law, contractors must pay prevailing wages to workers on projects classified as public works or that receive public subsidies equal to 30% or more of total costs and where such project costs are over $5 million, with certain exceptions.  *See* N.Y. Lab. Law § 224-a.

75.     A state fiscal officer (either the NYSDOL Commissioner or the Comptroller in New York City) is responsible for determining prevailing wage rates annually and publishing schedules of wages and supplements.  N.Y. Lab. Law §§ 220(5)(a), (e).

76.     New York Labor Law mandates that "the prevailing rate of wage … *shall be* the rate of wage paid in the locality … where the work is being performed."  *See* N.Y. Lab. Law § 220(5)(a) (emphasis added).  That rate is generally set based on CBAs between labor organizations and private employers employing at least 30% of workers in the same trade or occupation *in that locality*.  *Id.*  If union density is below 30%, the prevailing wage is based on the average wage paid in that trade and locality.  *Id.*

77.     In addition to paying those prevailing wages, any contractor or subcontractor who is subject to the prevailing wage law must maintain certified payrolls and comply with N.Y. Lab. Law §§ 220-i and 220-j.  *See* N.Y. Lab. Law § 220(3)(f)(ii).

78.     Under Section 220-i, the contractor must disclose past wage assessments, debarments (federal, state, or otherwise) within the last eight years, workplace safety violations, and other required information.  N.Y. Lab. Law § 220-i(2)(a).

---

discriminatory union membership policies excluded minorities from skilled positions.  *Id.* at 7–8.  New York's Court of Appeals has "taken judicial notice of the law's history and of the fact that the prevailing wage law's ban on the use of certain categories of unskilled workers has a discriminatory impact upon minorities."  *Id.* at 19.

79.     Under Section 220-j, the contractor must submit detailed monthly payroll records and a payment bond guaranteeing prompt payment to all persons furnishing labor or materials. *See* N.Y. Lab. Law § 220-j(2); N.Y. State Fin. Law § 137(1).

80.     Those payroll records must include each worker's name and address, the hours and days they worked, their occupation, hourly wage rates, and the supplements that were paid or provided. *See* N.Y. Lab. Law § 220(3-a)(a)(iii).

81.     NYSDOL Investigators have the authority to subpoena payroll and project records to confirm compliance with prevailing wage law, issue notices of withholding to departments of jurisdiction, and audit underpayments of prevailing wages and supplements.

**B.     The Consequences of Prevailing Wage Non-Compliance**

82.     Every contractor and subcontractor is required to notify their workers of the prevailing rates of wages and supplements for their job classifications at the start of every public works contract, and with the first payment after July first of each year, or face civil monetary penalties. *See* N.Y. Lab. Law § 220(3-a)(a)(ii).

83.     Statements submitted under the prevailing wage law are signed and filed under the penalty of perjury, and knowingly false statements are punishable under the New York penal law. *See* N.Y. Lab. Law § 220-c. Perjury convictions carry consequences ranging from class A misdemeanors to class D felonies, and penalties include up to ***seven years' imprisonment***, substantial fines, and in some cases, the loss of professional licenses.

84.     A contractor who bids on public work knowing that it is not registered, or who allows an unregistered subcontractor to commence work on a public project, faces a civil penalty of up to $1,000 after notice and hearing. N.Y. Lab. Law § 220-i(8)(a).

85.     The failure to furnish monthly certified payroll records may lead to a fine of $100 per day.  N.Y. Lab. Law § 220-j(3)(a).  Willful failure to file these records is a ***class E felony*** and punishable by a civil penalty of up to $1,000 per day.  N.Y. Lab. Law § 220(3-a)(a)(iii).

86.     The NYSDOL Commissioner may revoke or suspend registration after a hearing finding a contractor or subcontractor violated prevailing wage laws.  N.Y. Lab. Law § 220-i(8)(b).

87.     It is a misdemeanor to willfully pay less than the prevailing wage rate to applicable workers in the performance of a public works contract, and that conviction also comes with a potential fine, imprisonment, and for a second offense, forfeiture of the contract.  N.Y. Lab. Law § 220-d.  If that failure results in underpayment, the consequences include a ***class A misdemeanor*** (if the amount of underpayment is less than $25,000) or ***class E, D, or C felony*** (if the amount is greater than $25,000, $100,000, or $500,000, respectively).  *See* N.Y. Lab. Law § 220(3)(d)(i).

88.     A second conviction for willful underpayment results in debarment from public contracts and disgorgement of profits from public projects for five years. *See* N.Y. Lab. Law § 220(3)(d)(iii).

89.     New York debarment has consequences beyond its borders.  The federal government considers state debarment when determining whether to debar a contractor.  *See* 48 C.F.R. § 9.406-1(a)(15).

90.     Several states also consider debarment by other states in their contract award process.  Federally debarred contractors may be automatically barred from work in certain states, including Massachusetts.  As another example, Connecticut may take debarment in another state into account when considering whether to award a project to its bidders.

91.     Prevailing wage violations are subject to vicarious liability under N.Y. Lab. Law § 223, which provides that where a subcontractor fails to comply with or evades Article 8, "the contractor shall be responsible for such non-compliance or evasion."

C.      **The Amendment**

92.     Effective June 18, 2026, the Amendment adds a subsection (f) to New York's prevailing wage law, which provides:

(i)     For the purposes of this subdivision contractors or subcontractors engaged in custom fabrication shall not be regarded as material suppliers. For the purposes of this subdivision, a legal day's work for which the prevailing rate of wages for the New York county in which the public works project is situated shall be paid to laborers, workers and mechanics shall include custom fabrication regardless of whether the custom fabrication occurs on-site, off-site, or in another jurisdiction and such pay shall be a condition of the contract concerning all such custom fabrication work involving the contractor or employer awarded the public work contract, except where the project includes federal funding that triggers federal rules for wage requirements, and any subcontractor thereto shall pay the on-site prevailing wage required for workers at the site of the public work project to those workers performing the custom fabrication.

(ii)    To perform a public works contract each contractor or subcontractor who employs workers for custom fabrication work related to a public work project shall maintain certified payrolls and shall comply with sections two hundred twenty-i and two hundred twenty-j of this article.

(iii)   For the purposes of this subdivision the term "custom fabrication" shall include the fabrication of exterior or interior wall panel systems, woodwork, electrical, plumbing, heating, cooling, ventilation or exhaust duct systems, rebar cages, and mechanical insulation solely and specifically designed and engineered for a specified public work project. The term "custom fabrication" does not include components, portions, modules, or materials that are otherwise stocked or readily available absent a specified public work project.

(iv)    The provisions of this paragraph shall not include any highway, structure, vehicle or watercraft used to support transporting persons; the foregoing notwithstanding, this paragraph shall include electrical, plumbing, heating, cooling, ventilation or mechanical insulation work in rest areas, transit stations or depots.

22

(v)     Nothing in this paragraph shall be construed to apply the requirements set forth in section two hundred twenty-four-a of this article to any custom fabrication associated with the creation or rehabilitation of any residential dwelling units or manufactured home parks that are exempted from the definition of "covered projects" as set forth in section two hundred twenty four-a of this article.[5]

(vi)    The contractor awarded a public work contract, or a subcontractor thereto, shall be required to report to the department of jurisdiction the intent to utilize custom fabrication in a form and manner prescribed by the fiscal officer. Such reports shall identify the public work contract, the name and location of the custom fabrication entity, and description of the custom fabrication work. The contractor awarded a public work contract, or subcontractor thereto, shall notify any additional party contracted with for custom fabrication that the contract is subject to this subdivision. The department of jurisdiction, as defined in subdivision three-a of this section and including any entity to whom such department of jurisdiction delegates their authority, shall be required to report to the fiscal officer the intention to contract for custom fabrication in a form and manner prescribed by the fiscal officer. Such reports shall identify the public work contract, the name and location of the custom fabrication entity, and description of the custom fabrication work. Reports submitted to the fiscal officer shall be subject to disclosure pursuant to article six of the public officers law.

N.Y. Lab. § 220(3)(f).

93.    The Assembly's memorandum in support of the law listed its fiscal implications for state and local governments as "To be determined." In the Senate, the introducers memorandum listed the same fiscal implications as "None to the State," a statement which strains credibility on its face and is proven false by the successful efforts of transportation agencies to secure some level of carve out from the Amendment.

94.    The Amendment applies regardless of where fabrication takes place provided the covered items were solely and specifically designed for a New York public project. It requires fabricators, whether in New York or in other states, to not only pay prevailing wage rates based

---

[5] Section 224-A(4) exempts from "covered projects" construction work performed on a multiple residence and/or ancillary amenities or installations that is wholly privately owned where 25% or more of the units are affordable and subject to a regulatory agreement with a local, state, or federal governmental entity, or a not-for-profit with such an anticipated formal agreement.

23

on New York county wage schedules, but also to register with the NYSDOL, submit certified payrolls, and comply with N.Y. Lab. Law §§ 220-i and 220-j.

95.    Under the Amendment, the applicable prevailing wage rate is determined by the county where the public project is located, not where the fabrication work is performed.  A rural fabricator in upstate New York operating hundreds of miles from New York City is thus required to pay the highest prevailing wage rates in the State (and likely the world) for work performed on covered items at its own local facility.

96.    Moreover, the Amendment carves out some transportation, affordable housing, and modular home projects, while subjecting fabricators providing products to equally critical public works projects to full compliance.  These carve outs were part of a chapter amendment Governor Hochul made when she signed the bill into law on December 20, 2025, which was approved by the Assembly on January 29, 2026, and the Senate on February 4, 2026.

97.    When the legislature passed the chapter amendment, it also confirmed that it intended to enforce the Amendment against contractors as "a contractual obligation … That contract will include -- will be required to include custom fabrication prevailing rate."

### III.    The Amendment Regulates Commerce with Foreign Nations

98.    The Amendment by its express terms applies to fabrication performed "in another jurisdiction," a phrase that encompasses foreign nations.

99.    The legislature was aware of this international reach and confirmed it was intentional.  During debate on a prior iteration of the bill, A.373-B, Assemblymember Tague asked the bill's sponsor, Assemblymember Bronson: "What happens if the fabrication is taking place out-of-State or even out of the country?" (emphasis added).  The sponsor confirmed: "this would

anticipate that the prevailing rate would apply to that work nonetheless, even though it's in a different state."

100.    Assemblymember Tague pressed further, asking "if a contractor were to contract with somebody from Canada … are you telling me that the New York State Department of Labor can file suit against a Canadian company for not following the prevailing wage rate law?"  The sponsor responded by claiming New York had constitutional authority to require prevailing rates for work "performed in the different state with the fabricated product coming to New York State."

101.    The record therefore confirms the legislative intent that the Amendment would apply to fabrication in foreign countries, who will be subject to enforcement by the NYSDOL. Assemblymember Tague warned about the legality of this and predicted "a big legal challenge." The legislature proceeded regardless.

102.    Assemblymember Tague again raised the issue when the Assembly debated the chapter amendments in January 2026.  The sponsor confirmed enforcement would occur through "a contractual obligation" embedded in the public works contracts: "That contract will include – will be required to include custom fabrication prevailing rate."

103.    Assemblymember Giglio, a supporter of the Amendment, stated she was voting for the bill because her constituents were "having a really hard time competing with other companies of other states *and other countries* that are bringing materials in." (emphasis added).

104.    New York's construction industry relies on the global supply chain.  Specialized components used on New York public projects are manufactured in Germany, Mexico, Canada, and many other countries.  The Amendment purports to require these foreign manufacturers to pay New York prevailing wage rates to workers in their own countries, register with the NYSDOL,

25

submit certified payrolls to New York, and be subject to NYSDOL audits – all for work performed entirely outside of the United States.

105.    Plaintiff E.W. Howell recently completed a project in Central Park where the performance specification could only be met by a German-manufactured door system.  On another one of E.W. Howell's projects, exterior architectural panels it needed began by being fabricated in Germany, were sent to Mexico for treatment, and then returned to Germany for finishing before being shipped to the United States.  The Amendment imposes New York's regulatory scheme on fabricators in each of these countries.

106.    Some of these products do not have *any* alternatives that are manufactured in New York or even in the United States.  For example, there are no major elevator manufacturers in the United States. Specialized custom flue and chimney assemblies, life safety devices, and air handling equipment and diffusers are made in Canada and Mexico.  The Amendment threatens to render these products unavailable for public projects the people of New York need built.

107.    Even if out-of-country fabricators want to comply, New York's certified payroll process will require the disclosure of sensitive personal information, including social security numbers.  Workers in foreign countries may not possess social security numbers or any equivalent. Worse, the European Union's General Data Protection Regulation ("GDPR") restricts the transfer of personal data including employee names, addresses, wage information, and identification numbers to third countries.

108.    GDPR generally requires a lawful basis for processing employee personal data, and compliance with a foreign state's labor law may not constitute a lawful basis under EU law.  GDPR further mandates data minimization, requiring that personal data collection be limited to what is necessary for the processing purpose. Submitting granular, employee-level payroll data to a

26

foreign government regulatory agency for work performed entirely within the EU raises significant data minimization and cross-border transfer concerns under GDPR. Violations carry fines of up to €20 million or four percent of global annual revenue, whichever is higher.

109. The Amendment provides no mechanism for foreign fabricators to comply with these requirements or others like them, yet purports to subject those foreign fabricators to the full force of New York's prevailing wage enforcement apparatus, including criminal penalties, creating intractable conflicts, the only apparent solution for which is market exit.

110. The Amendment's improper and ill-conceived regulation of foreign commerce causes direct, concrete, and imminent harm to Plaintiffs and their members. GCs like E.W. Howell will be unable to bid or perform public projects that specify foreign-sourced products when those foreign manufacturers refuse to comply.

111. Fabricators like J&J Sheet Metal, LLC ("J&J Sheet Metal"), a Heating, Ventilation, and Air Conditioning ("HVAC") fabricator and installer based in Vestal, New York, and a member of Plaintiff NESCA, face the loss of foreign suppliers of air diffusers, fire smoke dampers, and other specialized products that are not made in the United States and for which there are limited or no alternative domestic suppliers. This threatens to put J&J Sheet Metal out of business.

112. Allied's contractor members, who rely on curtainwall component fabricators that are mostly located outside the United States, will be unable to find ready, willing, and able suppliers to furnish the materials they need to perform public works projects.

113. Indeed, all of Plaintiffs' members face harm when public projects New York wants and needs to build do not go forward, depriving companies of the opportunity to perform them. For example, if New York cannot get elevators, which are virtually all manufactured abroad, will every planned project with more than one story be put on hold?

27

114.    Industry groups warned the legislature and the Governor of these consequences, and that New York should not be regulating international commerce, but they enacted the Amendment regardless.

## IV.    The Amendment Discriminates Against and Substantially Burdens Interstate and International Commerce

115.    The Amendment violates the dormant Commerce Clause and a fundamental constitutional principle that New York cannot discriminate against out-of-state commerce or substantially burden interstate or international commerce.  It does so by transforming commercial supply chain relationships into heavily regulated subcontracting relationships.

116.    The Amendment is protectionist in aim and operation.  By conditioning participation in New York public projects on out-of-state fabricators submitting to the NYSDOL's regulatory jurisdiction and New York's prevailing wage schedules, registration, and certified payroll for work performed entirely elsewhere, the Amendment converts remote manufacturers into Article 8 subcontractors.  This is not New York expressing a preference for its own projects that entities in other states or countries can take or leave.  It is New York reaching into those states and countries, actively regulating and monitoring them, and punishing non-compliance.

117.    The legislative history of the Amendment clearly illustrates the legislature's intent to discriminate against out-of-state fabricators.  In a prior iteration of the bill, A.373/S.5475-B, the legislature included "Legislative findings and intent" which stated that "various custom fabricated materials on local public works construction projects are being entirely outsourced to workers at a location or locations away from the project site *or in foreign jurisdictions*, thereby … eliminating the employment of workers at the site of the project to the detriment of those workers *and the local economy*."  (emphasis added).

118.    When the Assembly debated that bill, Assemblymember Giglio asked:

So how does this relate to, say you want to buy products that are being produced off site from New Jersey or Connecticut. How do we enforce that prevailing wage law if a public works project chooses to buy their off site curtain walls or fabricated projects? How do we – *how do we isolate that to New York*? (emphasis added).

119. Assemblymember Bronson responded that the owner would include the prevailing wage mandate in the contract, to which Assemblymember Giglio responded she did not think that went far enough, but that she would support the bill and "hopefully we'll be able to tighten that up a little bit to say that public works projects should be bought from, because most of it is funded by the government, New York State, and by counties and by municipalities that that work, *it stays in the State of New York*." (emphasis added).

120. The bill's sponsors took the directive to "tightened it up" and did just that, adding the "or in another jurisdiction" language to the version of the bill that became law.

121. In 2025, when Assemblymember Giglio voted to support the Amendment, she reiterated its protectionist goal, stating she was supporting the bill because her constituents were "having a really hard time competing *with other companies of other states and other countries* that are bringing materials in." (emphasis added).

122. By mandating New York's prevailing wage rates and reporting requirements, the Amendment exerts New York's sovereign control extraterritorially for fabrication performed wholly outside the state, thereby overriding the labor standards, cost structures, and business expectations under which they invested in their home-state facilities.

123. That extraterritorial application forces out-of-state fabricators to choose between restructuring their home-state operations around New York law or abandoning the New York public works market.

124. The pool of out-of-state and international fabricators willing to supply New York public projects is already shrinking because of the Amendment, as fabricators on whom contractors

29

and public owners rely for public-work components announce they will refuse to bid rather than submit to wage and reporting mandates for New York public work.

125.    The Amendment's effect on interstate commerce is particularly grave in niche industries where only a handful of specialized fabricators supply products that cannot be sourced elsewhere, such as acoustic wall panels, ceiling products, wastewater components, air handling equipment, and proprietary door systems.  Those suppliers are unlikely to comply with these mandates, leaving no practical alternatives and impeding project delivery.

126.    Schultz purchases and installs complex wastewater processing equipment primarily received from non-New York suppliers.  It anticipates its fabricator partners will refuse to comply or simply stop bidding or quoting New York public works projects.

127.    When out-of-state and international fabricators leave the market, contractors and subcontractors will lose competitive bids, face higher prices, experience delays, and in some cases be unable to obtain the specified products needed to perform public projects.  Those projects will not get built, and there will not even be *on-site* workers making prevailing wages, let alone a few extra off-site workers as the Amendment naively contemplates.

128.    The Amendment's extraterritorial burden will increase costs to New York taxpayers and undermine public infrastructure delivery.

129.    The resulting risks are existential for Plaintiffs' members that rely on interstate channels of commerce.  Jobs will not go forward because of cost.  Public owners will be forced to reimagine, scale back, delay, or cancel projects when specialized suppliers refuse New York's out-of-state wage mandates.  Public owners, including local governments and school districts operating under property tax caps, cannot absorb increased project costs caused by the loss of efficient

construction methods, inability to find materials, or substantial compliance costs. These are substantial burdens on interstate and international commerce.

## V.    The Amendment Fails to Give Fair Warning of the Conduct it Covers

130.    The Amendment's harms go far beyond those affecting out of state fabricators. The Amendment is riddled with ambiguities that no one can understand – not the legislators who passed it, the NYSDOL charged with enforcing it, or the contractors, sub-contractors, and fabricators expected to comply with it.

131.    The Amendment fails to give fabricators fair notice of the conduct it covers, which allows the Defendants enforcing the law after June 18, 2026 to act in an arbitrary or discriminatory manner, and prevents regulated companies from ensuring their own compliance.

132.    First, terms such as "custom fabrication," "solely and specifically designed and engineered for a specific public work project," and "stocked or readily available" are undefined and do not apply to real-world manufacturing processes. Fabricators across different industries are left wondering what is required and how they may act accordingly.

133.    For example, STS Steel is a 100% employee-owned structural steel fabrication company located in Schenectady, New York and a member of Plaintiffs AGC NYS and NESCA, as well as the General Contractors Association of New York ("GCA"). STS Steel fabricates structural steel for buildings, bridges, hydraulic structures, and other structural applications involving steel shapes such as channels, angles, and structural steel components, including bridge members, building steel, lock gates for the NYS Canal System, and other custom-fabricated assemblies. All of its work is specific to project specifications, and New York public projects are currently approximately 80–90% of its workload. STS Steel cannot tell if structural steel is a

31

covered product under the Amendment. The Amendment does not list structural steel in its "shall include" list, and provides no actual definition of how the NYSDOL will define "custom."

134. Dimension Fabricators is a concrete reinforcement bar ("rebar") fabrication company located in Schenectady, New York, and a member of Plaintiffs AGC NYS and the Business Council. Its primary work involves fabricating rebar that strengthens concrete. That work includes preassembling large rebar cages and performing accessory work, including forging, bending, and welding. Rebar cages are included in the list of items covered by the Amendment, but Dimension Fabricators does not know if the Amendment applies to the full range of its fabrication activities, including bending, cutting, threading, forging and epoxying individual pieces of rebar. Dimension Fabricators also cannot tell from the Amendment how Defendants will enforce the Amendment if Dimension Fabricators manufactures a product for a private project that is later redirected to a public project for which it was not originally manufactured. Is that product "custom" or "readily available"?

135. The Amendment also does not articulate where in the manufacturing process the prevailing wage obligations attach.

136. Plaintiff NESCA's member J&J Sheet Metal's primary business is the fabrication and installation of ductwork for private and public projects. If an employee bends a piece of metal in its shop, J&J Sheet Metal presumes it will be covered. But what if an employee puts a piece of protective plastic cap on the ends of duct to keep dust out during shipping? What if an employee brushes sealant on the ductwork to prevent air leakage? What if an employee paints a piece of ductwork? Is any or all of this work custom fabrication for which prevailing wages must be paid?

137. A member of AGCA in Pennsylvania designs, engineers, manufactures, and installs precast concrete structures such as parking garages, large buildings, schools, hospitals, and other

32

structures.  The Amendment does not distinguish between "custom" and "stock" in a way that is meaningful in that manufacturer's industry, because the manufacturer takes stock components like rebar, mesh, and insulation, and combines them together for specific clients and projects.  Double tee concrete beams ("double-T beams"), for example, are common load-bearing structures made of standard inventory parts, but the final product itself is built to order, since High Concrete does not just have double-T beams lying around.  Is the combination of stock items for a specific customer necessarily "custom," rendering everything High Concrete produces subject to New York's prevailing wage scheme when it heads to a New York public project?

138.    General contractors who are vicariously liable for their subcontractors' prevailing wage violations have the same types of unanswered questions.  For example, Plaintiff Schultz frequently procures complex mechanical process equipment for drinking water and wastewater treatment projects.  That process equipment does not fit within the "shall include" categories but appears to be of a similar nature.  If Schultz cannot tell if Defendants intend to enforce the Amendment against fabricators of the process equipment it is sourcing for these critical public projects, how can it be expected to ensure compliance with prevailing wage law by those fabricators?

139.    AGC NYS's member Hoosick Valley Contractors, Inc. ("HVC") is a commercial general contracting company and a New York State Certified Women-Owned Business Enterprise based in Melrose, New York, with only 20 employees.  As a smaller company, it relies heavily on local subcontractors.  On a recent project for Green Correctional Facility, HVC subcontracted for detention doors, hardware, woven rod wall panels, and recreation pen enclosures and then sent those products to Hubbell Galvanizing, a hot-dip galvanizing facility in Oneida County, New York, to galvanize the products to prevent corrosion.  HVC cannot determine from the Amendment

33

whether galvanization – which is done by a wholly separate entity than the fabricator who made the products – is covered by the Amendment and whether HVC must ensure that the galvanizer registers and submits certified payroll.

140.    Other companies that are neither contractors nor fabricators are also uncertain about the scope of the Amendment and whether it impacts their operations.  For example, Curtis Lumber Co., Inc. ("Curtis Lumber") is a retail lumber and building materials company headquartered in Ballston Spa, New York.  As a retailer, Curtis Lumber sells wooden trusses for public projects, but does not manufacture or deliver them.  If the wooden trusses are considered "millwork" within the scope of the Amendment, is Curtis Lumber's work coordinating the sale between the manufacturer and the buyer of those trusses covered by the Amendment? Does that subject it to prevailing wage requirements and liability for non-compliance by the truss fabricators?

141.    These are just a few examples on what is a never-ending list that will only continue to grow in an industry constantly innovating new products.  Joseph Hogan has been the Vice President of Building Services at AGC NYS for 38 years.  It is his job to provide guidance on exactly these sorts of complicated issues.  He stated:

> In my professional assessment and based on conversations I have had with public owners, owner representatives, contractors, subcontractors, and fabricators, the Amendment's definition of "custom fabrication" has created widespread confusion among members in the construction industry.  The definition is so unclear that none of these industry participants can determine what is covered.
>
> With respect to the categories of included products, they go from somewhat specific to impossibly broad: "wall systems" – is that curtain wall, precast wall, a full curtain wall with windows?  Are windows a wall system?
>
> As to the difference between stock and custom, what about when a fabricator cuts rebar in half in the shop or cuts it down by six inches before shipping it – does that make the item custom?  There is vast confusion about what is covered because the language is so broad.   Anything that veers from a normal, off-the-shelf product may qualify, but it is impossible to know based on the language.

34

142.    This widespread confusion extends to project owners too.  An AGC NYS member acting as a Construction Manager ("CM") for a school district sent Mr. Hogan a list of items on a project the school district expects to put out for bid after June 18, 2026, seeking Mr. Hogan's opinion on whether each item would be covered by the Amendment.  Mr. Hogan could not give him answers on a significant number of items because it was impossible to tell whether those items were covered.  That uncertainty means the CM must explain to the school district that the project may not be able to go forward and that, if it does, there will be significant budgeting issues.  Upon information and belief, the project will likely not proceed.

143.    Even the NYSDOL has recognized that the Amendment has "key ambiguities."  On March 31, 2026, the NYSDOL (including Defendant McCready) met with members of the ABC Empire State Chapter, including representatives from J&J Sheet Metal and other fabricators.  The fabricators described their shop workflows and raised specific questions about vagueness in the Amendment concerning when prevailing wages and associated obligations attach in their process from manufacturing, packaging, storage, delivery, and pre-assembly work, and how stock or common parts are treated when later integrated into custom on-site work.  The NYSDOL representatives did not provide answers, acknowledged key ambiguities in the law, and stated they were still grappling internally with where prevailing wage obligations attach in a product lifecycle.

144.    The legislature and Governor were aware of the ambiguities in the law before they passed the law, but ignored these concerns and proceeded anyway.

145.    Assemblymember Walsh asked on behalf of a constituent whether custom, standard-sized kitchen cabinets would fall within the scope of the law.  The sponsor could not answer, stating "it's hard for me to give a – a direct answer to examples."

146.    Assemblymember Bologna asked whether a 12-foot widget modified to 11 feet for a particular project would be covered.  The sponsor could not provide a definitive answer, stating: "you're delving into the details of the implementation of the law.  We can't put every detail in statute, and we rely on the agency to do an implementation of this."

147.    Numerous organizations spanning various construction and business sectors echoed these concerns in submissions they sent to the Governor urging her to veto the law because the Amendment's vague and ambiguous terminology would expose contractors and suppliers to penalties despite good-faith compliance efforts.

148.    For example, the New York Electrical Contractors Association ("NYECA") warned that the term "custom" forced contractors to guess which components qualify, exposing them to enforcement actions and penalties despite good-faith efforts.

149.    Similarly, Albany Electrical Contractors Association ("AECA") expressed concern that: "In the electrical industry, many project-specific assemblies are created from standard, off-the-shelf materials.  Under this legislation, such assemblies could be improperly classified as 'custom fabrication.'"

150.    When prevailing wages are applied on site to construction projects, none of these questions arise.  Contractors, subcontractors, and their workers all know who is on the site, what work they are doing, and how to classify that work to pay their workers accordingly.

151.    The Amendment is a departure from these clear standards.  Its ambiguities mean the Amendment fails to provide fair notice to those it regulates and invites arbitrary enforcement.

## VI.   The Amendment is Impossible to Administer

### A.   Fabricators Cannot Track Work in the Manner Required.

152.   Even if contractors and fabricators could understand what conduct is covered under the Amendment, which they cannot, those obligations are impossible to comply with on the factory floor because of the nature of fabrication.

153.   These concerns were the central theme of the debate on the Assembly and Senate floors and the submissions to the Governor urging her to veto the law.

154.   Assemblymember Tague tried to raise the alarm about what he called "impossible administration requirements," in a floor debate on a prior iteration of the bill, A.373-B.   The warning, and others like it, fell on deaf ears.   He stated:

> … I worked in this industry … for almost 30 years.   And when you're doing prevailing wage rate with different classifications of job, usually those that work on road construction crews or [HVAC], they're used to doing this every day, ten hours a day, 12 hours a day.   But when you get into doing prefabrication and work like this back at the shop, they may be working on your project … for 45 minutes, another project for an hour that may not be a prevailing rate wage job. This is, to me, this is a bookkeeper's nightmare ....
>
> … continuing the example above, a prefabrication shop in Syracuse may be building components for projects across the State all under one roof.   An electrician may be building components that will be used in projects in various regions of the State, all within the same hour.   Under this bill, the time taken to build each component for each region would need to be tracked, and the prevailing wage for the project destination would need to be correctly applied for that time in a single hour.   In just a single hour an electrician building these components may be required to be paid several different prevailing rates for the same hour.   Similarly, it would need to be tracked for each component, whether the component is headed for a public or a private job.

155.   Last summer, Assemblymember Walsh stated she was voting against the law after discussing its recordkeeping requirements with a constituent: "she's a relatively small business, and she said that it was gonna really be a big problem for her …and for other businesses like hers."

37

156.   Assemblymember Tague reiterated his prior sentiments when the Assembly debated the chapter amendments, calling the Amendment a "payroll nightmare" and explaining: "they work on something for 45 minutes for one job and we gotta [pay] them prevailing rate?  That – that's a problem.  Especially when you have a company that's got 3- or 400 employees."

157.   The sponsor dismissed these concerns, stating: "I suggest to you that these construction companies will be able to work this out."

158.   Assemblymember DiPietro disagreed with the sponsor, stating that: "Three weeks ago in my district, ten miles from my home, one of my good friends who is a realtor had me come and sit with a company that was going to expand ....  Two days before the closing they pulled out because of this bill.  Specifically because of this bill ....  They're not expanding anymore.  They're looking to leave the State.  So just on the construction of the new building alone on 18 acres just cost 140 jobs; 140 jobs not happening because of this bill … if you love putting small business out of business, you love this bill."

159.   Those businesses and the associations they are members of echoed these concerns in submissions they sent to the Governor urging her to veto the law as impossible to administer.

160.   Plaintiff AGC NYS warned the legislation "would establish an economically destructive precedent for New York" and "have a negative impact on interstate and international commerce, areas that New York should not be regulating."

161.   Plaintiff the Business Council warned that many custom fabricators, and especially smaller ones, did not have the compliance infrastructure needed to satisfy complex payroll reporting and registration requirements, and that many would choose to stop bidding on public work rather than absorbing new liabilities.

162.    Industry organizations warned the legislation imposed unworkable administrative burdens on contractors who do not employ, supervise, or control the workers performing off-site fabrication but remain liable, and would harm small businesses in particular.

163.    AECA described the requirement that that GCs investigate and verify the origins of prefabricated materials and certify payroll for workers they do not employ, including workers outside of the State, as "a near-impossible requirement."

164.    Associations representing union shops agreed. GCA, representing approximately 150 union contractors in the heavy civil construction industry, explained that contractors do not control whether prevailing wage can be paid to manufacturing workers based on the fabrication plant location.

165.    The harms are real for Plaintiffs' members, because fabricators cannot comply with the law.

166.    Dimension Fabricators does not operate in clean, project-specific increments – it works with five-ton bundles of 60-foot bars.  When it has multiple jobs using the same size bar, shear lines cut rebar for 10 to 20 different jobs simultaneously, before sending material down conveyers to benders, threaders, forgers, and crane operators.  Dimension Fabricators cannot track how many minutes each worker in each department spends on specific projects.  And even if it could do so with any semblance of accuracy, the attempt would decimate its productivity.

167.    STS Steel, which as explained above cannot tell if its work is covered under the Amendment, employs 44 fabricators who work on multiple projects simultaneously and perform a variety of tasks throughout the day, including welding, grinding, heating, cutting, running machinery such as drills, mills, and saws, moving material, fitting parts, and performing quality control inspections.  STS Steel moves workers between tasks and projects as needed, so that no

39

one stands idle. A single worker may work on three to four different jobs in a single day, and some of those may be public projects while others are private.

168.    If STS Steel's work is covered, it will be required to track, minute by minute, which component is being built, who is working on it, where it will be installed, and whether it is for a New York public project, then cross-reference that time with the applicable prevailing wage rate for the county where the project is located. STS Steel's materials are not fabricated in clean hourly increments. In a single hour, an employee may work on components destined for multiple regions, and for public and private projects. Multiple workers touch the same product at various stages of production, and each activity could carry a different prevailing wage rate depending on the destination county. This is simply unworkable.

169.    Even if STS Steel's employees could accurately track their time as the Amendment requires, which they cannot, turning that time into payroll will be a nightmare. STS Steel's payroll person reviews employee timecards and enters the information into a payroll system, which applies each employee's hourly rate from a master file. Under the Amendment, someone would have to manually change the pay rate for each group of hours (or minutes) worked on each covered project and then change it again for the next project. This process leaves enormous potential for error, exposing STS Steel to violations for failing to properly pay prevailing wages.

170.    J&J Sheet Metal also cannot track its work in a way that makes it possible to comply with the Amendment. J&J Sheet Metal's fabrication process begins with raw metal in 9000-pound rolled coils. J&J Sheet Metal runs the metal off the coil line, flattens it, cuts it to size, and places it on a table with a programmed cutting system. From there, other employees feed the material through forming machines, others hammer the pieces together, others seal the ductwork to prevent air leakage, others apply protective plastic on the ends for shipping to keep out dirt, and a driver

40

ships the finished product. In a single day, five to seven different employees will touch a single piece of fabricated ductwork, and each of those employees may work on anywhere from one to twelve different jobs throughout the day.

171.    J&J Sheet Metal pays its employees at one similar shop rate per day.  Under the Amendment, J&J Sheet Metal will need to track what each employee is doing minute by minute, the project it is for, whether that project is public or private, and which county's prevailing wage rate applies.  That is not realistic for the HVAC fabrication industry.  J&J Sheet Metal's employees do not work on a single project for hours at a time.  They shift between tasks and projects constantly.  The shop foreman alone works on eight or more jobs in a single shift, each with its own job and phase codes.

172.    Coreslab Structures (Conn) Inc. ("Coreslab") is a custom fabricator of architectural, high-performance precast concrete wall systems in Thomaston, Connecticut that supplies products to Plaintiff E.W. Howell, among other contractors.  Coreslab's process involves multiple stages: engineering and design, procurement of project-specific materials, fabrication of rebar cages, assembly in custom formwork, pouring of custom concrete, installation of insulation panels, curing, application of finishes specified by the architect, and loading for transport.  Coreslab has 36 production workers including rebar tiers, concrete placement crews, crane operators, finishing crews, and loading crews.  All of them work on most projects, and Coreslab typically has multiple projects running through the plant at one time, including public and private work.  Coreslab does not have a system for logging workers in and out of specific projects and is not aware of any that could track the complex, dynamic, multi-step fabrication process it uses.

173.    Pleasant Mount Welding, Inc. ("PMWI") is a metal fabricator headquartered in Carbondale, Pennsylvania, with approximately 135 employees operating out of four facilities in

41

Pennsylvania. PMWI supplies its metal products for water and wastewater treatment plants, including projects that Plaintiff Schultz works on. PMWI works on many projects across the public and private sectors at once. It buys raw material in bulk that is unloaded when it arrives by employees whose time cannot be separated out by project. The raw material then goes into manufacturing software, which looks for common parts and components and allocates them across jobs. That software may tell a worker, for example, to make ten cuts in a 40-foot piece of material. The saw operator does not and cannot stop between each cut to log the time it took to make the cut. The same is true for each of the next steps in PMWI's fast-moving, systemized process, which include departments for layout, base plates, welding, shop blasting, painting, and shipping. To apply different prevailing wages based on the county in New York where each item will end up, to a fraction of each hour, across PMWI's entire workforce is not something PMWI can do.

**B.    Companies Cannot Verify Compliance by Off-Site Third Parties.**

174.    At least fabricators have visibility in their own shops. When fabricators subcontract out parts of the process, they are left hoping their subcontractors comply with the law, but having no way to know if they do. The Amendment imposes vicarious liability for the prevailing wage compliance of their subcontractors, yet provides no workable mechanism for verifying that compliance at off-site facilities.

175.    PCINE member Unistress Corporation, a precast concrete manufacturer based in Pittsfield, Massachusetts, subcontracts approximately 30% of its rebar needs to outside shops and uses two to three such facilities. It makes the rest of its rebar itself. The only conceivable way for Unistress to verify that those other rebar shops are properly tracking and paying prevailing wages on its projects would be to station a full-time monitor at each facility. But those shops would never permit it, and for good reason, as they are rebar fabrication competitors. No fabricator will open

its shop floor to a competitor's full-time observer, exposing its proprietary processes, pricing strategies, and production methods to a rival. Even if a shop were to permit such access, the monitor would have no realistic way to determine which pieces of rebar in the facility belong to its project as opposed to the many others occurring at any given time.

176.   Contractors face a similar challenge. It is impossible to verify the accuracy of how fabricators are tracking and paying prevailing wages with no visibility into the process.

177.   Plaintiff NECA's member Gross Electric Inc. urged Governor Hochul to veto the bill, cautioning that it imposes unworkable administrative burdens on site contractors such as itself "to investigate the origins of prefabricated materials, even for workers they do not employ and who may not even be in New York State" and "determine and certify how much time was spent on specific prefabrication tasks – a near-impossible requirement."[6]

178.   Plaintiff E.W. Howell has no way to monitor compliance inside a remote fabrication facility. At a job site, it can compare certified payrolls to daily reports, sign-in sheets, and internal records showing who was on the site on a particular day. That type of verification is not possible with fabrication shops that are hundreds or thousands of miles away. For example, in a project E.W. Howell had where it sourced an exterior architectural panel was made in Germany, sent to Mexico for treatment, and returned to Germany for finishing, before being shipped to the United States, E.W. Howell would not be able to track compliance. Even if E.W. Howell had someone following the panels from factory to factory around the world, it would not know how to determine in a busy factory which panel belonged to its public project or some other unknown project.

---

[6] NYECA similarly warned that the Amendment carried with it "paralyzing administrative complexity that would slow or halt prefabrication operations entirely" in the electrical contracting space, and individual subcontractors likewise warned that the legislation would be "impossible to comply with and equally impossible to enforce."

179.    HVC complies with the pre-existing prevailing wage structure in much the same way as E.W. Howell.  For off-site fabrication, there is no realistic way to verify compliance.  For example, HVC purchased acoustic wall panels from a company in Utah for a project at SUNY Cobleskill.  That involved months of back-and-forth between that company and the owner about shop drawings and samples before final panels were ordered and made.  Do Defendants expect HVC to physically station someone in the Utah facility during the shop drawing process and while the pieces are made?  How is a company the size of HVC (with only 20 employees) supposed to do that – let alone afford to do that?  And how would HVC even know which products were theirs?  Is that Utah shop expected to invite everyone onto their factory floor?

180.    In sum, the Amendment exposes these companies to severe penalties for prevailing wage law non-compliance even though compliance is impossible, a plainly untenable result.

**VII.    The Amendment's Arbitrary Carve Outs Lack Any Rational Basis and Leave Other Equally Critical Areas of Projects Within its Scope**

181.    The Amendment's arbitrary carve outs for some transportation, affordable housing, and modular home projects treat similarly situated fabricators differently based on the type of public project for which a product is destined, even when the shop-floor work is the same.  There is no rational basis for this unequal application.

182.    In her approval memorandum, Governor Hochul explained that she "exempt[ed] certain transportation and affordable housing-related projects to mitigate costs associated with these essential projects."  When asked why the Governor carved out some transportation work, the bill sponsor provided a non-explanation: "The Executive was concerned about having this 100 percent apply to all transportation work, and so there was a request that we narrow it … [so] what we tried to do is carve out some transportation work but not all of it, and to make sure that the work that involves electrical work, plumbing, heating, cooling, ventilation or mechanical

44

insulation work in rest areas, transit stations and depots would all still be included. But there would be some transportation that would be excluded."

183. Michael Elmendorf II, President and CEO of AGC NYS, has been informed by representatives of the MTA that the MTA pushed for the transportation exclusion because, if the Amendment applied to work on subway platforms alone, the cost would run into the billions of dollars. The State thus acknowledged, through the MTA's successful lobbying, that the Amendment imposes crushing burdens on the industries it covers – and then chose to shield transportation from those burdens while leaving functionally identical work on schools, universities, wastewater treatment facilities, and other public infrastructure fully exposed.

184. If the cost impact on transportation alone would be so enormous as to warrant a blanket exemption, there is no rational basis for subjecting other categories of public work where Plaintiffs' members perform the same types of fabrication using the same processes, the same workers, and the same equipment to the Amendment's full burden.

185. The carve-out is not a tailored policy choice; it is the product of special interest lobbying, granting relief to those with the power to obtain it while imposing identical economic harm on those without such power.

186. There is no meaningful difference when a fabricator manufactures a product for a transportation project versus a school, or affordable housing versus a conventional public building. Plaintiffs' members working on equally critical public infrastructure such as schools, wastewater treatment facilities, and university projects receive no such relief.

187. For example, Dimension Fabricators performs rebar fabrication using the same equipment and the same workers across covered and excluded project types. The rebar fabrication

45

Dimension Fabricators performs for highway projects is identical to the fabrication it performs for non-transportation public works projects.

188. STS Steel fabricates bridge members, building steel, lock gates, and other custom assemblies. The operations STS Steel performs for bridge fabrication are identical to those for building fabrication: it cuts the material, drills the material, puts parts on it, welds the material, and paints the material. There is no rational reason to pay workers making these products differently based on where the products end up.

189. For Schultz, a structural steel beam can be delivered to a bridge project and the manufacturer will not need to pay prevailing wages because it is a transportation-related project, nor will Schultz need to be concerned about vicarious liability over that subcontractor for non-compliance. When that very same steel beam is used by Schultz to build a wastewater treatment plant, the prevailing wage scheme applies.

190. Similarly, the systems Unistress builds for parking garages support vehicles both in motion and stopped, just like a bridge during rush hour. There is no rational basis for treating one as exempt and the other as covered. The irrationality deepens at the product level: A beam for a bridge and a double-T for a parking garage both need enough strength to have cars drive and park on them, and the general manufacturing process is the same.

191. Unistress also manufactures concrete piles, which are sub-foundation pieces used to support structures, that can be used interchangeably for bridges, parking garages, or buildings. If Unistress has two jobs requiring identical pieces, it might pull them together on the same production day for efficiency. Under the Amendment, it would need to break them into different jobs even when the product is the same, simply because one destination is exempt and the other is not.

192.    These arbitrary distinctions harm Plaintiffs and their members by reducing the number of eligible suppliers, increasing bid prices, and forcing different compliance obligations on otherwise similarly situated public works participants.   The resulting classifications are disconnected from any meaningful difference in the work performed, the workers protected, or the public projects served.

193.    The Equal Protection Clause does not permit the State to impose prevailing wage obligations, criminal liability, and debarment risk on a fabricator producing products for a parking garage while exempting the fabricator next door producing functionally identical products for a bridge, based on nothing more than the end use of a product manufactured through an indistinguishable process.

194.    The use of industry classifications themselves is also flawed because projects can span industries, and where an industry being and ends is not always a bright line.  The Brownsville Arts Center and Apartments project in Brooklyn, New York illustrates the point.  That project received funding to include 200 to 300 affordable housing units as part of its scope but also encompasses an Arts Center that is not exempt under the Amendment.

195.    The precast concrete units for the project – including architectural wall panels, columns, and structural beams – structurally support both the Arts Center and the affordable housing units integrated into it, and are commissioned under a single contract.  If that project was let after June 18, 2026, how would the manufacturer of those units determine how much of its fabrication work serves the exempt affordable housing component versus the non-exempt Arts Center space?  The Amendment provides no mechanism for apportioning work on such a mixed-use project, leaving fabricators and contractors to guess whether all, some, or none of their work triggers prevailing wage obligations.

196.    This is not a hypothetical compliance difficulty – it is a present impossibility that demonstrates the carve-out lacks any rational basis, as it cannot be coherently applied to the very type of project it was designed to address.

197.    The State cannot constitutionally impose regulatory burdens on one class of contractors and fabricators while exempting another class performing materially indistinguishable work, based on nothing more than the ability of the exempted class to advocate for itself in the legislative process.

## VIII.    The Amendment Impairs Businesses' Substantial Investments

198.    Fabricators have made substantial investments in facilities, machinery, production lines, payroll systems, trained workforces, certification programs, and business relationships based on the expectation that off-site manufacturing would not be subject to New York prevailing wage regulation, as it was not for decades.  The Amendment is not just a financial strain – it destroys or substantially diminishes the economic value of those investments by forcing fabricators either to overhaul their entire operations or to exit the New York public works market.

199.    Dimension Fabricators has been in continuous operation for 42 years.  In the past three years, Dimension Fabricators has invested over $5.5 million in equipment based on the expectation that it will be able to use that equipment to serve its markets competitively, including in New York.  Dimension Fabricators took loans from the bank to purchase the equipment with the reasonable expectation that prevailing wages would not apply to its factory where they have never applied.  A significant part of the business case for the investment was the large volume of public works coming up in New York, and Dimension Fabricators needed the equipment to be competitive in that market.

200.    PMWI has invested four decades of capital and effort in its four facilities, its engineering and drafting staff, its fabrication equipment, its American Institute of Steel Construction quality certification, and its workforce of approximately 135 people.  Those investments were made with the expectation that PMWI's fabrication processes in Pennsylvania would be governed by private contract, market forces, and the applicable law where it operates, not by New York county prevailing wage schedules imposed on work performed entirely in Pennsylvania.  The Amendment destroys substantial economic value of that investment, and PMWI's ability to continue serving the New York public market, without compensation.

201.    Unistress made its business investments expecting Massachusetts labor standards to apply to work performed in its Massachusetts facility, not New York's standards.  The Amendment's extraterritorial requirement fundamentally restructures Unistress's existing business practices and contracts.

202.    Coreslab made substantial investments in its manufacturing equipment, production systems, and trained workforce based on the reasonable expectation that its labor costs would continue to be determined by Connecticut market forces, not New York prevailing wage rates.

203.    Contractors and subcontractors have also invested substantial resources in supplier networks, bidding systems, payroll and accounting practices, project staffing, leases, and apprenticeship programs based on the expectation that off-site fabrication would remain governed by market conditions and ordinary commercial terms.

204.    Schultz has a thirty-year lease with the industrial park serving as its office, shop, and yard.  Schultz has also invested significantly in its payroll and accounting systems, equipment, and employees, all made with the reasonable expectation that labor costs for off-site fabrication would continue to be governed by market forces, not government-mandated prevailing wage rates.

If the Amendment depletes Schultz's project portfolio to the level anticipated, Schultz will be unable to fulfill its lease obligations or maintain current employment levels. The Amendment impairs those investments by imposing new compliance costs, supply-chain disruptions, and liability risks on work performed by remote third parties.

### IX. The Amendment Substantially Impairs Fabricators' Existing CBAs

205. The Amendment also substantially impairs existing contractual relationships and is not reasonable or necessary to serve its stated public interests.

206. Industry associations with members that are union shops warned the Governor that the Amendment would disadvantage union contractors, disrupt collectively bargained labor arrangements, and "unwittingly set[] a trap for union construction contractors."

207. Assemblymember Tague raised similar concerns on the Assembly floor in considering the prior iteration of the bill, warning "an electrician working under a negotiated CBA in one region would be required to be paid the prevailing rate of a region to which the component is sent. For example, in the case that a fabrication shop in Syracuse is building components for a housing project in New York City, the electrician in Syracuse would be paid the prevailing rate for New York City."

208. That is exactly what will happen come June 18, 2026.

209. For example, PCINE member Unistress has a CBA with Laborers Local Union 473 that provides work classifications and rates of pay negotiated between Unistress and its union through December 31, 2027. The CBA states that erection workers (i.e., on-site construction workers) get paid prevailing wages. Non-erection workers (i.e., off-site fabrication workers) get paid based on their job classification, at rates negotiated for and set forth in the CBA. Those rates are not optional – they are mandatory.

50

210. The CBA includes "negotiated 'Wage Increases for January 1, 2025 through December 31, 2027.'" The CBA provides when workers "will be paid" certain rates. It also provides that workers who work in a higher classification job for more than one (1) day "shall receive" the higher classification rate, with certain exceptions.

211. The CBA does not allow Unistress to pay certain workers fabricating in its facility New York prevailing wages while others engaged in the same class of work are paid according to the CBA wage structure.

212. The CBA also does not allow Unistress to change "the existing benefits or privileges during the term of the Agreement" absent written agreement with the Union. The Taft-Hartley Act, 29 U.S.C. § 186(a), (c), reinforces this obligation by requiring labor agreements to set forth the "detailed basis" for those supplemental fringe payments the employer pays into trust funds established by union representatives for the employees' benefits.

213. Similarly, in-state fabricator J&K Plumbing and Heating Co., Inc. ("J&K Plumbing"), which is a fourth-generation, family-owned, full-service mechanical contractor based in Binghamton, New York, is party to a CBA with Local 112 that requires workers to receive negotiated rates of pay for all hours worked. J&K Plumbing's CBA specifies that any changes to fringes and benefits must be negotiated and agreed upon by the union, and does not permit J&K Plumbing to pay workers with the same classification different rates for doing the same tasks.

214. Specifically, J&K Plumbing's CBA states workers "SHALL RECEIVE THE REGULAR RATE OF PAY FOR ALL HOURS WORKED" and that "ANY CHANGES IN THE FRINGES AND/OR BENEFITS SHALL BE NEGOTIATED AND AGREED UPON BY THE BUSINESS OFFICE OF LOCAL NO. 112."

215. The CBA does not permit the employer to pay workers with the same classification different rates for doing the same tasks, but the Amendment forces fabricators to do exactly that, paying rates based on multiple project-locations for shop work performed at the plant, thereby rewriting those plant-level arrangements without the parties' consent.

216. The Amendment forces Unistress and J&K Plumbing to choose between complying with the prevailing wage requirements or honoring their CBA obligations, creating an impossible conflict between statutory and contractual duties.

217. That change substantially impairs existing wage structures, plant-level agreements, and workforce practices by replacing seniority-based, skill-based, or collectively bargained shop rates with county-specific public-work rates unrelated to the location or nature of the shop work.

## X.    **The Amendment Will Cause Additional Irreparable Harm**

218. In addition to infringing upon Plaintiffs' and their members' constitutional rights, which itself is irreparable harm, the Amendment will irreparably harm their businesses, goodwill, and relationships, as well as the supply chain of products New York needs for its public projects.

219. The Amendment's sponsor in the legislature stated that Defendants will enforce the Amendment as "a contractual obligation," i.e., against Plaintiffs' contractor members who are awarded bids for New York public projects after June 18, 2026.

220. After June 18, 2026, public projects will continue to be advertised; Plaintiffs' members will continue to be required to submit binding bids on those projects; and fabricators will continue to be called upon to quote pricing for products that may or may not fall within the Amendment's undefined parameters.

**A.**      **Businesses Are Leaving Markets, Losing Profits, and Will Potentially Close.**

221.    Many of the products installed by Plaintiffs and their members, including precast concrete, sheet metal, rebar, and structural steel, are common features of essentially *every* construction project.  The fabricators of these critical products have already indicated they will no longer participate in New York's public works market come June 18, 2026.

222.    Dimension Fabricators will no longer bid on New York public projects once the Amendment takes effect, because it is administratively impossible for Dimension Fabricators to comply.  Dimension Fabricators will look to shift its work to other states, but even so, it estimates its bidding activity will decrease by 30-40% once the law takes effect.  This will impair its capital investments, cause severe operational disruptions, damage Dimension Fabricators' goodwill and established business relationships, and result in permanent injury to its business.

223.    STS Steel will not be able to bid on future New York public projects if the Amendment takes effect.  New York public projects currently constitute 80–90% of its workload, meaning the Amendment is an existential threat to the viability of the company and the jobs of its 58 employee-owners.

224.    J&J Sheet Metal will not be able to bid on prevailing wage jobs in higher-rate counties where it has worked in the past, including Sullivan, Ulster, Rockland, Westchester, and Orange County.  Closing large segments of its business will likely cause J&J Sheet Metal to lay off employees.

225.    Coreslab informed E.W. Howell that it would not be paying New York prevailing wage in the fabrication of precast units – thereby exiting the market for future projects.  Coreslab has already stopped bidding on New York public projects in anticipation of the law taking effect,

which account for more than half of its business.  If Coreslab cannot replace that revenue, it faces workforce reductions and the potential closure of its Connecticut facility.

226.    PMWI has informed Schultz that it will stop providing pricing for New York public works projects.

227.    Unistress is strongly considering abandoning the New York public works market, which accounts for 15-20% of its revenue.

228.    Allied has heard from its members that a substantial number of fabricators have said they will simply refuse to bid on work destined for New York public works projects.

229.    HVC was told by one subcontractor it frequently uses, Bonacio Steel, that it will no longer be bidding on New York public projects because it cannot comply with the Amendment given that it has 10–12 jobs on the shop floor at any given time.  This impacts an existing project HVC has at Queensbury Elementary School, where Bonacio Steel has a contract to perform approximately $320,000 of steelwork on Phase I of an addition to the school.  Because Bonacio Steel will not bid on the second phase of the project, HVC and the project owner are losing the efficiency of using a subcontractor already on site for phase one of the project and were forced to get quotes from other steel subcontractors.  HVC received only two quotes on the second phase, and does not know how competitive those bids were or whether the school district will have to pay more because of the lack of competition.  This is all before the Amendment even takes effect.

**B.    New York Will Not Get the Components It Needs to Build Critical Projects.**

230.    Like so many industries, construction is inextricably intertwined with the global supply chain.  Many of these fabricators who are exiting the New York public market are among the only companies in the country – or the world – capable of supplying the specialized products that New York's public infrastructure requires.

54

231. Contractors will lose access to established suppliers, face inflated pricing from the few suppliers willing to comply, and be forced to absorb compliance costs that cannot be recovered from public owners.  Fewer suppliers means competition will decrease and prices will go up.  With these exits, contractors are being forced to make bidding decisions, change supplier relationships, and plan for compliance now, even before the Amendment takes effect.

232. The GCA warned in opposing the bill that "New York State does not have the existing fabrication capacity to absorb the amount of work that is currently obtained from out of state or international fabricators."

233. On the floor, Assemblymember Bologna asked what would happen if a public project required a custom component that could only be sourced from North Carolina.  The sponsor confirmed that if the North Carolina fabricator refused to pay New York prevailing wages, the contractor would not be eligible to use that product on the project.  If that product were integral to the project, that project would not get built.

234. Mr. Elmendorf has spoken with major public owners on projects critical to public health, such as wastewater treatment facilities, where custom-fabricated components are used as a matter of course, and it is not uncommon for only one place in the world to make certain components these facilities need.

235. For example, Schultz depends on an already limited pool of qualified fabricators – including PMWI – for specialized drinking water and wastewater components.  If Schultz feels a project is unachievable due to the constraints discussed above, Schultz cannot bid it.  Once the Amendment takes effect, Schultz anticipates it will need to find a new and different path to revenue to sustain its business, as Schultz currently attributes about 80% of its revenue to New York public works projects.

236. Coreslab does not know if there are architectural precast cladding fabricators in New York. Its market is highly specialized, and it competes with fabricators in Canada and other regions of the country, meaning there is no in-state fabricator to replace it if it is forced to exit the New York public works market.

237. Unistress similarly reports that there is no precast concrete company in New York that does chip fabrication plants, and none that focus on parking garages as Unistress does that will be able to step into that market.

238. J&J Sheet Metal does not believe there are any manufacturers of the custom flue and chimney assemblies, life safety devices, and air handling equipment it needs in New York, which is currently gets from other states, Canada, and Mexico.

239. Fabricators in these critical industries are stating that they will cease bidding on New York public projects once the Amendment takes effect, leaving public owners without the specialized suppliers they need.

240. The Amendment will thus deprive New York's public owners of access to irreplaceable specialized suppliers, making it impossible to complete critical public infrastructure projects – not because there is a willing alternative, but because the Amendment has driven away the only companies capable of performing the work.

**C.      Relationships and Reputations Will Be Destroyed.**

241. Even where contractors and fabricators try to comply, the risks of noncompliance threaten to put them out of business anyway.

242. Contractors and subcontractors – and fabricators, when they subcontract out work – bear the risks associated with their fabricators' payroll mistakes or noncompliance with New York's prevailing wage law, which includes criminal and civil penalties.

243.    Roughly half of E.W. Howell's business is New York public work.  E.W. Howell has built its reputation with public owners, subcontractors, suppliers, and project partners over 135 years in the New York construction market.  The Amendment forces E.W. Howell to choose among unacceptable options: try to comply with unclear and unworkable requirements, take on liability for off-site work it cannot monitor, pay inflated costs, lose suppliers, or limit public works opportunities that make up a substantial part of its business.

244.    If a fabricator cannot or will not comply after contract award, a contractor like E.W. Howell may be unable to supply the specified product, default under the prime contract, and face termination for cause, liquidated damages, non-responsibility findings, or reputational injury on future public bids. Contractors may also be subject to a non-responsibility finding or termination for a prevailing wage violation.  Either is devastating to a contractor, and a "black mark" that follows a contractor for years, if it survives.

245.    Curtis Lumber has been a local, family-owned business across upstate New York and Vermont for over 130 years.  Curtis Lumber has relationships with contractors and builders that go back decades.  Having to tell longtime customers that Curtis Lumber cannot supply their public projects damages those relationships.

246.    PMWI is concerned that the reputational consequences alone from even a single compliance mistake will follow it into every other state where they do work and threatens to destroy its business.  If employees leave or if PMWI's national supply chain pulls back from New York, those relationships do not come back on command.

247.    PCINE is concerned that once suppliers exit the New York public works market, those business relationships built over years – or decades – will not easily be restored.  The goodwill, established supply chains, and institutional knowledge will be permanently lost.

57

248.    Allied's members, who built their businesses around their supplier relationships, will permanently lose those established relationships and be unable to bid on public projects.

249.    The Amendment disrupts longstanding supplier relationships that contractors and subcontractors rely on to prepare competitive bids, and contractors are already experiencing fabricators' withdrawal from the New York public works market.

250.    These kinds of harms cannot be undone or compensated with money after the fact.

## XI.    The Amendment Harms the Workers It is Intended to Help

251.    The devastation that will be wrought by this law is for nothing.

252.    One of the bill sponsor's propounded reasons for passing the law is that it helps workers by closing a "loophole" in the existing prevailing wage structure that contractors have been using to evade prevailing wage requirements.  The Amendment, in fact, *harms* workers by upending off-site fabricators' processes and destabilizing and eliminating their jobs.

253.    The Amendment creates immediate workforce harms by undermining shop morale, training, apprenticeship programs and opportunities, and employee relations.

254.    Industry organizations opposing the Amendment warned it would aggravate existing workforce shortages in the skilled trades which were "already facing severe worker shortages – masonry, carpentry, plumbing, HVAC, and electrical."

255.    Employees working side by side on the same shop floor will receive sharply different wages based not on skill, seniority, or working conditions, but on the destination county of the component they happen to touch.  Fabricators are concerned about the very real issues paying employees different rates on the shop floor will have on their workforce morale.

256.    Dimension Fabricators cannot pay different rates to employees working the day shift of approximately 40 workers, where perhaps ten employees might be working on New York

public works jobs earning prevailing wage while the other thirty are working on private or out-of-state jobs at their regular rates. Dimension's President explains: "Workers talk. They whisper in each other's ears. The resulting resentment and inequity among our workforce will create significant turmoil on the shop floor."

257. STS Steel's CEO has warned that, even if he could apply these different rates to his workers, which he cannot, "Can you imagine what people are going to say when the person next to them is getting paid a different rate for the same work? The resulting inequity among the workforce, who are all employee-owners, will create major issues with operational cohesion. Labor rates are different in the field for legitimate reasons, but imposing field-level prevailing wage rates on the shop floor ignores these differences and will cause unrest among our employee-owners and make it impossible for me to run the shop floor."

258. PMWI's owner believes it will be hard to run its shop due to the pay disparities, and predicts there will be fights about it on the shop floor.

259. Coreslab's vice president and general manager worries that paying different wages will demoralize its workforce. Workers will refuse to work on lower-paying projects and demand to be assigned to higher-paying ones. He warns: "that is a great way to drive away talented workers and quickly put yourself out of business."

260. This Amendment also conflicts with established prevailing wage law and how the prevailing rate are set. Under the statute, "the prevailing rate of wage … *shall be* the rate of wage paid in the locality … where the work is being performed," which is determined based on CBAs between unions and employers who perform public or private work in the same trade or occupation *in that locality* or, if union density is below 30%, the *average wage paid* in that trade *and locality*. *See* N.Y. Lab. Law § 220(5)(a) (emphasis added). Applying prevailing wage rates of the project

59

site to off-site fabrication breaks this necessary link between local market rates and prevailing wages.

261.    When fabricators are required to pay the prevailing rates of wages of the locality where the project is being built, as opposed to where the fabrication work is being done, the resulting wage differential can be particularly problematic.  There is a tremendous difference between the wages a fabricator in a small town in upstate New York pays its employees and the prevailing rate of downstate counties where they send their products.

262.    J&J Sheet Metal, for example, is concerned about the serious resentment that will occur if two employees standing side by side are paid dramatically different rates – going from $30 per hour on a private job to as much as $102 on a public job – depending on the destination of the product.

263.    J&K Plumbing calls the pay system "a completely unsustainable wage model that we believe will threaten the team dynamic and company culture we have worked for generations to foster."

264.    Billings Sheet Metal, d/b/a Billings Steel Manufacturing ("Billings"), a custom steel fabricator in Olean, New York with five employees, is concerned about the resentment prevailing wage opportunities will create in its small shop.  Billings' co-owner predicts her company will need to rebuild its production processes to create some system of fairness among employees to ensure everyone has the same opportunity to earn prevailing wages and they are not arbitrarily denying some employees that benefit.

265.    In addition to destabilizing the current workforce, the Amendment hurts the next generation of workers by gutting training opportunities.

266. Several of Plaintiffs' members are involved in New York's apprenticeship program, which allows fabricators to pay apprenticeship rates to train the next generation of workers. Apprentice rates depend on meeting specific journeyman-to-apprentice ratios. On the project site, apprentices clock in and out while working at the job.

267. It will be impossible for these fabricators to continue employing apprentices, because they cannot track those ratios when journeyman and apprentice rates are broken down in minute-by-minute increments based on the project where the item being fabricated will end up. On the manufacturing floor, project-specific apprentice ratios will shift minute by minute as shop workers move among public projects.

268. For example, J&J Sheet Metal has five registered apprentices. Managing apprentice ratios is already difficult in the field, where employees usually stay on one job all day, but will be impossible in the shop, where someone might move from a prevailing wage job to a private job and back to another prevailing wage job in short increments. The law will limit J&J Sheet Metal's ability to use the shop to train apprentices (where apprentices are supposed to spend time as part of their training), because it will have to pay journeyman rates on prevailing wage work unless ratios are satisfied at every moment – an impossible administrative burden.

269. The Amendment leaves J&J Sheet Metal with no choice but to turn down work it has historically performed, lay off employees who depend on it for their livelihoods, and fundamentally and detrimentally alter a business that has operated successfully for over 80 years.

270. J&K Plumbing is similarly concerned that the Amendment will choke its ability to employ and train the next generation because young and unskilled workers would have to be paid like senior workers or, more realistically, terminated.

271. Billings also cannot justify putting interns on prevailing wage work at the rates required, limiting the use of public works projects as learning opportunities.

272. The Amendment is preventing fabricators from keeping their current staff and from training their next generation of workers, in industries that are already hurting for workers.

**FIRST CAUSE OF ACTION**
*Brought by All Plaintiffs*
**Declaratory and Injunctive Relief for Violation of the Foreign Commerce Clause of the United States Constitution (42 U.S.C. § 1983)**

273. Plaintiffs reallege and incorporate herein Paragraphs 1 through 272.

274. The foreign Commerce Clause of the United States Constitution grants Congress the exclusive power "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3.

275. The Supreme Court has held that this grant of power to Congress implies a greater limitation on state authority over foreign commerce than over interstate commerce, because "foreign commerce is pre-eminently a matter of national concern."  State measures that interfere with that uniformity are unconstitutional.

276. The Amendment violates the foreign Commerce Clause because it directly regulates commerce with foreign nations by imposing New York's prevailing wage regime on manufacturers in foreign countries for work performed entirely on foreign soil.

277. The Amendment requires foreign fabricators of products whose work is performed entirely outside the United States, under foreign labor laws, by workers who are citizens of foreign nations, to submit to New York's entire prevailing wage regulatory apparatus or be excluded from supplying New York public projects.

278. The Amendment's regulation of foreign commerce causes direct, concrete, and imminent harm to Plaintiffs and their members.

279.    Contractors regularly source custom components from manufacturers in Germany, Canada, Mexico, and other countries because the required products are not available from domestic suppliers.  Those who source these products will be unable to bid or perform public projects that specify foreign-sourced products because foreign manufacturers will refuse to comply.

280.    The Amendment creates a substantial risk of provoking retaliatory action by foreign governments, because nothing prevents those nations from imposing reciprocal regulatory burdens on New York manufacturers exporting products abroad.

281.    The Amendment also impairs the federal government's ability to speak with one voice in regulating foreign commercial relations.

282.    The Amendment's interference with foreign commerce was not inadvertent. The legislative history reveals that  the Amendment was motivated in part by a desire to shield in-state fabricators from foreign competition.

283.    Defendants are liable under 42 U.S.C. § 1983 for these constitutional violations.

284.    Plaintiffs seek declaratory and injunctive relief barring enforcement of the Amendment as applied to foreign commerce, including preliminary relief before the June 18, 2026 effective date.

285.    Given the Amendment specifically contemplates application to foreign commerce, and the legislative history reveals this to be a protectionist measure intended to shield New York businesses from harm that would otherwise result from the Amendment, including rendering them non-competitive, the enforcement of the Amendment should be enjoined in its entirety.

## SECOND CAUSE OF ACTION
*Brought by AGCA, NESCA, NECA, and PCINE Against All Defendants*
**Declaratory Relief and Injunctive Relief for Violation of the Dormant Commerce Clause of the United States Constitution (42 U.S.C. § 1983)**

286.    Plaintiffs reallege and incorporate herein Paragraphs 1 through 272.

287.   The Dormant Commerce Clause prohibits state measures that discriminate against interstate commerce and, if facially neutral, those that impose burdens on interstate commerce that are clearly excessive in relation to their putative local benefits.

288.   The Amendment is per se invalid under the Dormant Commerce Clause because it discriminates against interstate commerce both in purpose and effect.  Its legislative history reflects a protectionist aim to favor in-state fabricators over out-of-state competitors, and its operative provisions condition participation in New York public projects on out-of-state fabricators submitting to New York's wage schedules, registration, and certified-payroll regime, thereby imposing unique burdens on non-New York fabricators and advantaging in-state ones.

289.   The Amendment's design and real-world operation prefer in-state economic interests by converting extraterritorial fabricators into registered subcontractors under Article 8 of the New York Labor Law solely because their products will be installed in a New York public project, while compelling compliance with New York county prevailing rates, certified payrolls, and the associated regulatory scheme regardless of where fabrication occurs.  That structure undermines out-of-state suppliers' ability to compete on price and predictability and deters them from bidding New York public work, shrinking interstate supply.

290.   The State is regulating, not merely participating in, the market.  The Amendment wields sovereign power to impose wage, registration, and reporting mandates on remote fabricators.  The State had other means to advance its local interests that would not have burdened interstate commerce but chose not to use those nondiscriminatory means.

291.   In the alternative, if the Amendment is deemed evenhanded, it fails because it imposes substantial, non-speculative burdens on interstate commerce that are clearly excessive relative to any putative local benefits.

292.    The Amendment is creating industry-wide operational disruptions and market contraction as out-of-state and international suppliers are exiting the market or refusing to bid, forcing contractors to restructure nationwide supply chains, and requiring fabricators to overhaul their production systems to attempt minute-by-minute project-destination wage tracking, inventory segregation, and payroll reprogramming – tasks that are infeasible in multi-project fabrication plants and that impede the interstate flow of goods.

293.    The burdens are magnified by the Amendment's extraterritorial application.  The Amendment burdens interstate and international commerce by requiring out-of-state and foreign manufacturers to register with New York, pay New York county prevailing wage rates, and submit New York certified payrolls for work performed wholly outside New York.

294.    The Amendment shrinks the pool of qualified suppliers and delaying or preventing critical public projects that depend on specialized out-of-state components.

295.    By contrast, the State's asserted benefits are speculative or marginal.  The State's carving out of large categories of transportation and affordable-housing work from the Amendment to shield that work from these burdens is an acknowledgment that the Amendment's costs are crushing while its benefits are uncertain.  Any legitimate interests could be advanced through non-discriminatory, project-neutral tools that do not dismantle national supply chains.

296.    Defendants are liable under 42 U.S.C. § 1983 for these constitutional violations.

297.    Plaintiffs seek declaratory and injunctive relief barring enforcement of the Amendment, including preliminary relief before the June 18, 2026 effective date.

**THIRD CAUSE OF ACTION**
*Brought by All Plaintiffs*
**Declaratory and Injunctive Relief for Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983)**

298.    Plaintiffs reallege and incorporate herein Paragraphs 1 through 272.

299.    The Amendment is void for vagueness under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 6 of the New York Constitution.

300.    The Amendment fails to give persons of ordinary intelligence fair notice of what types of manufacturing processes and products are covered by the Amendment, while exposing them to significant criminal and civil penalties for non-compliance.

301.    The Amendment is also void for vagueness because as applied to the Plaintiffs and their members, it does not give them notice of what types of manufacturing processes and products are covered by the Amendment, while exposing them to significant criminal and civil penalties for non-compliance.

302.    The Amendment also invites arbitrary and discriminatory enforcement because it lacks and defies any reasonable standards for enforcement.

303.    Defendants are liable under 42 U.S.C. § 1983 for these constitutional violations.

304.    Plaintiffs seek declaratory and injunctive relief barring enforcement of the Amendment, including preliminary relief before the June 18, 2026 effective date.

**FOURTH CAUSE OF ACTION**
*Brought by All Plaintiffs*
**Declaratory and Injunctive Relief for Violation of the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution (42 U.S.C. § 1983) and Article I, Section 7 of the New York Constitution (Takings)**

305.    Plaintiffs reallege and incorporate herein Paragraphs 1 through 272.

306.    The Amendment constitutes an unconstitutional taking by substantially impairing Plaintiffs' and their members' businesses without just compensation.

66

307. The Amendment will destroy Plaintiffs' and their members' net income. Those who cannot comply will lose their entire business or large portions of it. Those, if any, who can comply, will have their profits destroyed due to the administrative burden and cost.

308. Plaintiffs and their members have invested significant capital in their businesses, including in payroll and accounting practices, leases, hiring decisions, manufacturing processes, and business intake, all requiring overhaul to comply with the Amendment. The Amendment interferes with their investment-backed expectations.

309. The off-site fabrication business model has existed for decades without this regulation. These decisions and investments were all made with the reasonable expectation that costs relating to labor would continue to be dictated by market conditions, and that the investments they could continue to operate in a way that made their investments worthwhile. The Amendment destroys those expectations.

310. The Amendment, although purporting to serve public interests, benefits no one – not even the workers themselves. The Amendment will cause the cost of New York public projects to skyrocket and stop projects from being built and workers from being employed on those projects. It will also cause many fabricators to stop bidding work in New York and, if they cannot replace that market, lay off employees. The Amendment serves the limited interests who lobbied for it – not important public interests.

311. The Amendment does not advance any "common good." Indeed, the carveouts signal that even the legislature and Governor understand the Amendment does not serve an important public interest – because they exempted certain transportation and affordable housing work from coverage.

312.    The legislature's indication that it intends to enforce the law in other jurisdictions through "the contracts" shows that this law unfairly places the expense, liability, and risk of fabricators' potential non-compliance on New York contractors, rather than society at large.

313.    Defendants are liable under 42 U.S.C. § 1983 for these constitutional violations.

314.    Plaintiffs seek declaratory and injunctive relief barring enforcement of the Amendment, including preliminary relief before the June 18, 2026 effective date.

## FIFTH CAUSE OF ACTION
*Brought by All Plaintiffs*
### Declaratory and Injunctive Relief, for Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983) and Article I, Section 11 of the New York Constitution (Equal Protection)

315.    Plaintiffs reallege and incorporate herein Paragraphs 1 through 272.

316.    The Amendment violates the Equal Protection Clause of the Fourteenth Amendment and Article I, Section 11 of the New York Constitution, which require that the reason for treating two groups differently be rationally related to a legitimate government interest.  The irrational and arbitrary classifications created by the Amendment render it unconstitutional.

317.    The Amendment carves out fabrication work for certain types of projects, including some transportation, affordable housing, and modular home projects, from its requirements while subjecting other functionally similar industries to full compliance.

318.    These exemptions create arbitrary classifications affecting which fabricators face the compliance burdens and additional costs of the prevailing wage law.  The classifications are simply the product of special interest lobbying.

319.    Contractors using covered fabricators are exposed to significantly more liability than contractors using non-covered suppliers, despite both being engaged in public works projects using the same components.

320.    In addition, two similarly situated workers (one who performs work for a public project that will eventually crosses a county line and one who does not) are treated dramatically differently under the Amendment, with no rational basis for the distinction.

321.    Defendants are liable under 42 U.S.C. § 1983 for these constitutional violations.

322.    Plaintiffs seek declaratory and injunctive relief barring enforcement of the Amendment, including preliminary relief before the June 18, 2026 effective date.

### SIXTH CAUSE OF ACTION
*Brought by Business Council, NESCA, NECA, PCINE, and Allied Against All Defendants*
**Declaratory Relief and Injunctive Relief for Violation of the
Contract Clause of the United States Constitution (42 U.S.C. § 1983)**

323.    Plaintiffs reallege and incorporate herein Paragraphs 1 through 272.

324.    The Amendment violates Article I, Section 10 of the United States Constitution, which prohibits state governments from passing any law impairing the obligation of contracts.

325.    Many fabricators, including PCINE and Allied's fabricator members, have union contracts.  The Amendment undermines fabricators' existing CBAs by requiring them to reclassify their workers and pay New York prevailing wages to employees who have contractually-negotiated classifications and wages.

326.    Off-site fabricators have historically been free from prevailing wage regulation. Long before the Legislature began debating the imposition of prevailing wage requirements on off-site fabrication, fabricators entered into voluntary CBAs with their workers.

327.    These fabricators reasonably expected that their existing contractual relationships would continue to be governed by market forces, not government-mandated prevailing wage rates, as has been the case to date.

328.    The Amendment permanently impairs fabricators' contractual rights with no opportunity to reinstate these rights.

329. The Amendment does not serve a significant and legitimate public purpose, instead serving the interests of a narrow class – in-state labor unions. The legislative history of the Amendment highlights not so veiled purpose of economic protectionism for in-state workers, desiring to shield in-state fabricators from out-of-state competition rather than serve a broad societal goal.

330. Moreover, the legislative history shows a certain hostility to AGC NYS's members.

331. There is also a lack of fit between the justification offered for the legislation and its structure. Rather than helping workers, the legislation has negative impacts on the construction the industry by increasing costs and eliminating jobs, all while its stated aim was to fix a purported "loophole" to ensure workers are paid appropriate wages. The legislation has broad application, not just to those who are setting up fabrication sites off-site to evade paying prevailing wage. The legislation harms rather than helps those workers it purports to protect by forcing employers to take on less public works projects, reducing efficiencies so driving up costs, increasing workplace hazards by forcing work back on site, and eliminating fabrication jobs.

332. Finally, the means chosen to accomplish the Amendment's stated purpose are not reasonable or necessary. Minimum wage requirements are still in effect which ensure fair wages, and market forces and competition presently ensure that workers are paid like wages in the counties where they work. The Amendment disrupts that natural capitalistic process.

333. The Amendment was not enacted under any emergency circumstances.

334. The Amendment was enacted to advance the interests of special interest groups as opposed to protect the interests of the public at large.

335. The economic burden of the Amendment falls largely on general contractors and fabricators. There is no compensation mechanism for the losses imposed on contractors and

70

fabricators and there is no relief in sight for those adversely affected by the Amendment, as it is permanent in operation. Contractors and fabricators affected by the Amendment will face longstanding supply chain disruptions, increased costs, vicarious and joint and several liability, and impairment of existing contracts, all of which will have a chilling effect on the very work the Amendment purports to protect.

336.    A judicial determination of the invalidity of the Amendment is necessary and appropriate to avoid the deprivation of federal constitutional rights that results from applying the Amendment to Plaintiffs' and their members and other affected parties.

337.    Defendants are liable under 42 U.S.C. § 1983 for these constitutional violations.

338.    Plaintiffs seek declaratory and injunctive relief barring enforcement of the Amendment, including preliminary relief before the June 18, 2026 effective date.

## SEVENTH CAUSE OF ACTION
*Brought by All Plaintiffs*
**Declaratory Relief and Injunctive Relief Because
the Amendment is an *Ultra Vires* Act Prohibited under the Commerce Clause**

339.    Plaintiffs reallege and incorporate herein Paragraphs 1 through 272.

340.    An "ultra vires" act is one that goes "beyond the scope of power allowed or granted …by law."  Black's Law Dictionary (12th ed. 2024).

341.    A state law that violates the United States Constitution is not merely voidable – it is void *ab initio* and of no legal force or effect, because the state never possessed the power to enact it.

342.    The Commerce Clause provides that "Congress shall have Power ... [t]o regulate Commerce with foreign Nations and among the several States...."  U.S. Const. Art. I, § 8, cl. 3.

343.    Under the Commerce Clause, state regulatory powers must give way before the superior authority of Congress to legislate on (or leave unregulated) interstate commerce matters.

344.    With respect to international commerce, the foreign Commerce Clause reserves to Congress the *exclusive* power to regulate commerce with foreign nations, reflecting the constitutional judgment that the Nation must speak with "one voice" in regulating commercial relations with foreign governments.

345.    With respect to interstate commerce, the dormant aspect of the Commerce Clause prohibits states from projecting their regulatory authority into other states to control conduct that takes place wholly beyond their borders.

346.    The Amendment is void *ab initio* because New York and the Governor lacked the constitutional power to enact it.

347.    First, the Amendment violates the foreign Commerce Clause by imposing New York's prevailing wage regulatory scheme on manufacturers in foreign nations for work performed entirely outside the United States.  This is an attempt by a single state to impose its labor standards on sovereign nations – a power reserved exclusively to the federal government.

348.    The Amendment's attempt to regulate foreign commerce is doubly impermissible: it not only exceeds New York's inherent sovereign authority but invades the exclusive province of the federal government.

349.    Second, the Amendment violates the dormant Interstate Commerce Clause by directly controlling commerce occurring wholly outside New York's borders.

350.    Because the Amendment exceeds the limits of New York's sovereign authority under the Commerce Clause, it was void at the moment of its enactment.  The Governor lacked the power to sign it into law, and Defendants lack the power to enforce it.

351.    Defendants' imminent enforcement of the Amendment will constitute an *ultra vires* act – the exercise of power the State does not possess – causing immediate and irreparable harm to Plaintiffs and their members.

352.    Defendants are liable under 42 U.S.C. § 1983 for the deprivation of Plaintiffs' and their members' federal constitutional rights under color of state law.

353.    Plaintiffs seek a declaration that the Amendment is void and of no legal force or effect, and a preliminary and permanent injunction enjoining Defendants from enforcing the Amendment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and grant the following relief:

A.  A declaration that the Amendment is void and of no legal force or effect; or alternatively;

B.  A declaration that the Amendment violates:

　　1.  The Foreign Commerce Clause, U.S. Const. art. I, § 8;

　　2.  The Dormant Commerce Clause, U.S. Const. art. I, § 8;

　　3.  The Due Process Clause, U.S. Const. amend. XIV;

　　4.  The Equal Protection Clause, U.S. Const. amend. XIV;

　　5.  The Takings Clause of the Fifth Amendment, as incorporated by the Fourteenth Amendment, U.S. Const. amends. V, XIV; and

　　6.  The Contract Clause, U.S. Const. art. I, § 10; and

C.  Just compensation, according to proof, for any taking of property; and

D.  A temporary restraining order and preliminary injunction enjoining the State from enforcing the Amendment pending the final resolution of this action; and

E.  A permanent injunction enjoining the State from enforcing the Amendment facially or as applied against Plaintiffs' members; and

F.  An award of fees, costs, expenses, and disbursements, including attorneys' fees to which Plaintiff is entitled pursuant to 42 U.S.C. § 1988 and other applicable law; and

G.  Such other and further relief as the Court deems just and proper.


Dated: May 28, 2026                                    HINCKLEY, ALLEN & SNYDER LLP
       Albany, New York

                                     By:    _/s/ Chad J. Caplan_____
                                            Chad J. Caplan, Esq. (Bar Roll No. 518605)
                                            Janelle A. Pelli, Esq. (Bar Roll No. 710303)
                                            Jeremy Smith, Esq. (Bar Roll No. 510948)
                                            30 South Pearl Street, Suite 1101
                                            Albany, New York 12207
                                            P: (518) 396-3100
                                            E: ccaplan@hinckleyallen.com
                                               jpelli@hinckleyallen.com
                                               jsmith@hinckleyallen.com

                                            *Attorneys for Plaintiffs, Associated General
                                            Contractors of New York State, et al.*

74